0406

Benjamin F. CLARK, Administrator of the Estate of Angela Latreva Brown, Respondent, v. Sam H. ROSS, III and Thomas Collings, Appellants.

(328 S. E. (2d) 91)

Court of Appeals

---

[1] *See* 61A Am. Jur. (2d), *Pleadings*, Section 405.

*Betty J. Gambrell Cobb* of *King & Cobb, Jackson L. Barwick, Jr.* of *Belser, Baker, Barwick, Ravenel, Toal & Bender,* Columbia; *H. Grady Kirven* and *Steven C. Kirven* of *Watkins, Vandiver, Kirven, Gable & Gray,* Anderson, *for appellants.*

*Glenn W. Thomason* and *Michael F. Mullinax* of *Long, Thomason & Mullinax,* Anderson, *for respondent.*

Heard Nov. 21, 1984.

Decided March 6, 1985.

GOOLSBY, Judge:

In this medical malpractice action by the respondent Benjamin F. Clark, the Administrator of the Estate of Angela Latreva Brown, against two physicians, the appellants Sam H. Ross, III, M.D., and Thomas Collings, M.D., the questions on appeal relate to (1) the admissibility of certain testimony, (2) the limitation placed on the cross-examination of an expert witness, (3) the sufficiency of the evidence to support the verdict against each physician, (4) the trial judge's failure to grant a mistrial, (5) the trial judge's jury instructions, (6) the amount of damages, and (7) the award of certain expenses to Clark. We affirm as to both physicians the judgment represented by the jury verdict in Clark's favor in the amount of $175,000 actual damages and the award of expenses, including attorney fees, made by the Honorable Walter T. Cox, Jr., in the amount of $1,541.40. We reverse as to both physicians the judgment represented by the award of expenses, including attorney fees, made by The Honorable Clyde A. Elzroth in the

amount of $2,396.40 and remand the issue for redetermination.

Angela Latreva Brown became ill on Monday, July 2, 1979, while visiting her grandparents, Benjamin F. and Dorothy Clark, in Williamston, South Carolina. She complained of headaches and of the light hurting her eyes. Latreva also had a fever and experienced vomiting. Six days earlier, Latreva's grandmother removed a tick from Latreva's scalp following a fishing trip Latreva had taken with her grandparents and a cousin, Deirdre McClellan.

The following day, Latreva's grandmother took her to see Dr. Ross, a general practitioner who practices medicine in Williamston. He diagnosed Latreva as having tonsillitis and sinus congestion and prescribed a form of penicillin for her.

Latreva's condition, however, steadily worsened. She continued to suffer from headaches and a fever. Also, the light still hurt her eyes. By Wednesday evening, a rash, which the grandparents thought resulted from a reaction to the medicine, covered Latreva's chest and extremities. She complained of muscle and joint aches.

The grandmother took Latreva to Dr. Ross once again. This time, Dr. Ross diagnosed Latreva's condition as Fifth's disease, a malady similar to measles. He gave the grandmother a cortisone cream to put on the rash.

Latreva did not improve. After learning late Friday that Deirdre had been admitted by Dr. Collings, a pediatrician, to the Anderson Memorial Hospital for treatment of Rocky Mountain Spotted Fever, Latreva's grandparents took Latreva to the emergency room at the same hospital. Dr. Collings examined Latreva but would not admit her. He too diagnosed Latreva's condition as Fifth's disease.

Latreva's condition deteriorated. On Saturday morning, Latreva's grandmother again called Dr. Ross. He instructed her to take Latreva to Dr. Colquit Sims, Jr., an Anderson pediatrician.

Dr. Sims saw Latreva about 10:30 a.m. and determined she was in shock. He immediately sent her to the Anderson Memorial Hospital where treatment for Rocky Mountain Spotted Fever was begun by Dr. Steven Robert Horn, a second-year family practice resident.

Latreva died at approximately 11:00 p.m. that night. She was six years old. The pathology report states Latreva's death

resulted from complications associated with Rocky Mountain Spotted Fever.

Clark's complaint charges that the failure of Dr. Ross and Dr. Collings to diagnose and treat Latreva for Rocky Mountain Spotted Fever caused her death.

## I.

### A.

Both physicians complain of the trial judge's admission in evidence of the grandmother's testimony that quoted Dr. Sims as saying when he first looked at Latreva, "This thing has done went too far." They objected to the testimony on the ground that the statement attributed to Dr. Sims constituted inadmissible hearsay. The trial judge, citing the Federal Rules of Evidence, which neither our legislature nor our Supreme Court has yet adopted, held the statement admissible as a present sense impression. *See* FED. R. EVID. 803(1).

We recently observed in *Hall v. Palmetto Enterprises II, Inc., of Clinton,* 282 S. C. 87, 317 S. E. (2d) 140 (S. C. App. 1984), that the admission or exclusion of evidence is within the sound discretion of the trial judge and that the exercise of his discretion will not be disturbed on appeal absent a clear showing of an abuse of discretion, the commission of legal error in its exercise, and prejudice to the rights of the appellant. *See also S. C. State Highway Dept. v. Rural Land Co.,* 250 S. C. 12, 156 S. E. (2d) 333 (1967); *Welch v. Whitaker,* 282 S. C. 251, 317 S. E. (2d) 758 (S. C. App. 1984).

Assuming Dr. Sims's out-of-court statement constituted inadmissible hearsay [*see Addyman v. Specialties of Greenville, Inc.,* 273 S. C. 342, 257 S. E. (2d) 149 (1979); *Bain v. Self Memorial Hospital,* 281 S. C. 138, 314 S. E. (2d) 603 (S. C. App. 1984); W. Reiser, *A Comparison of the Federal Rules of Evidence with South Carolina Law* at 42 (2d ed. 1983)], neither physician demonstrated any prejudice resulting from its admission by the trial judge. Dr. Sims testified at trial and thus afforded both physicians the opportunity to cross-examine him regarding the statement. In this state, the admission in evidence of inadmissible hearsay affords no basis for reversal where the out-of-court declarant later testifies at trial and is available for cross-examination.

*State v. Caldwell*, S. C., 322 S. E. (2d) 662 (1984); *State v. Huggins*, 275 S. C. 229, 269 S. E. (2d) 334 (1980).

We note also Dr. Sims testified at trial that he recognized Saturday morning upon examining Latreva her condition "was just shocking" and that it was not "any real diagnostic thing [for him] to say something terrible was happening."

The admission, then, of Dr. Sims's hearsay statement provides no basis for us to upset the judgment below and grant a new trial.

### B.

Dr. Ross questions the ruling by the trial judge allowing Clark's medical expert, Dr. Ralph Sheldon Bell, to testify, over objection, in response to a hypothetical question that, according to Dr. Ross, assumed a fact not proven.

Dr. Bell, who is a pediatric physician from Long Island, New York, and a Clinical Professor of Pediatrics at Stoneybrook University, was asked to assume, among other things, that a hypothetical child on the third day of her illness had a rash on her legs, arms, and chest. Dr. Ross objected to the hypothetical question on the ground that the record contained no evidence that on the third day of her illness Latreva had a rash on her legs.

The evidence in the record at the time the hypothetical question was asked, however, suggests the presence of a rash on Latreva's legs on the third day of her illness. Before Dr. Bell was asked to assume certain material facts, Dr. Horn testified without objection that, when he took Latreva's history, the grandmother related to him that "the child began having a rash" on Tuesday evening, the second day of her sickenss, and that the grandmother "first noticed it on the legs."

Although Clark did not specifically prove Latreva had a rash on her legs on the third day of her illness, that fact was certainly inferable from and well within the range of the evidence then in the record. The trial judge committed no error, therefore, in allowing Dr. Bell to give his opinion in response to the hypothetical question. *Wright v. Graniteville Co., Vaucluse Division*, 266 S. C. 88, 221 S. E. (2d) 777 (1976).

## C.

Dr. Collings and Dr. Ross both contend that the trial judge improperly allowed Dr. Sims, in response to a hypothetical question from Clark's counsel, Mr. Mullinax, to testify to what he himself would do under the circumstances. Only Dr. Collings, however, is in a position to argue the point. Dr. Ross neither objected to the admission of the testimony nor moved to strike it. *Shockley v. Cox Circus Co.*, 204 S. C. 353, 29 S. E. (2d) 491 (1944).

As we noted before, Dr. Sims is the pediatrician to whom Latreva was referred for treatment on the day she died. He has practiced in Anderson County for thirty-two years and has treated "probably a hundred" cases of Rocky Mountain Spotted Fever. During Dr. Sims's direct examination, he was given a hypothetical situation based upon certain facts said to constitute Latreva's condition when seen by Dr. Collings in the emergency room on Friday evening. Mr. Mullinax then asked:

Q. [G]iven the hypothetical situation . . ., would it be your opinion that a reasonable, medical practitioner would have treated that patient based on those symptoms?

. . . .

THE WITNESS: [Dr. Sims] He's asking me an average person. I can tell him what I do, but I can't tell him what an average doctor would do.

THE COURT: I'm going to permit Dr. Sims to say what he would do and explain why he would do it, but I may strike his testimony.

. . . .

A. I would treat with terramycin. . . .

Q. All right, based on that hypothetical, you would treat with terramycin?

A. Yes, sir.

. . . .

Q. Well, why would you treat, what are you suspecting?

A. I'd be suspecting Rocky Mountain Spotted Fever. . . .

The trial judge refused to strike Dr. Sims's response to counsel's question even though he recognized that what Dr.

Sims himself would have done under the circumstances posed by the hypothetical question would not be relevant. *See King v. Williams*, 276 S. C. 478, 279 S. E. (2d) 618 (1981); *Welch v. Whitaker, supra.* The trial judge interpreted Dr. Sims's response to the hypothetical question, however, to mean that a reasonable competent practitioner would have done exactly what Dr. Sims stated he would have done under the conditions and circumstances outlined in the hypothetical question. So interpreted, the trial judge committed no error in admitting the evidence.

In any case, Dr. Collings fails to establish a manifest abuse of discretion on the part of the trial judge in allowing the response in evidence. Nowhere does he challenge as erroneous the interpretation laced upon Dr. Sims's response by the trial judge who, unlike us, was present listening to the witness and observing his mannerisms and the way he answered questions.

Moreover, even if we were to hold that the trial judge ■■ committed error in not striking Dr. Sims's response to the hypothetical question, Dr. Collings would not benefit therefrom because he does not demonstrate his rights were prejudiced by the trial court's failure to strike the response. In fact, a showing of prejudice would be difficult, if not imposible, to make in view of the cumulative testimony of Dr. Bell and Dr. Horn. Both physicians testified in response to similar hypothetical questions that a failure to treat the hypothetical child for Rocky Mountain Spotted Fever would constitute a deviation from the required standard of care. As this court held in *Gasque v. Heublein*, 281 S. C. 278, 315 S. E. (2d) 556 (S. C. App. 1984), reversal is not warranted where evidence erroneously admitted is merely cumulative. *See also Wright v. Graniteville Co., Vaucluse Division, supra.*

### D.

Dr. Ross maintains that the trial judge improperly allowed both Dr. Horn and Dr. Bell to testify as to certain statistical probabilities concerning whether Latreva most probably would have lived had treatment for Rocky Mountain Spotted Fever commenced earlier. Dr. Collings does not now contest the admission of this evidence although he objected to it at trial.

This case was tried once before and resulted in a mistrial. Dr. Horn testified under oath at the first trial and his testimony was preserved. The trial judge at the second trail ruled Clark could use Dr. Horn's former testimony. Dr. Horn was asked during the first trial if he had an opinion as to whether Latreva would have lived had treatment for Rocky Mountain Spotted Fever started on Friday, July 6, 1979. Dr. Ross did not object to the question when it was asked. Clark argued to the trial judge that Dr. Ross's failure to object to the question at the first trial constituted a waiver of his right to object to the question at the second trial. The trial judge agreed and allowed the question.

South Carolina, however, appears, to follow the better view that testimony given by a witness at a former trial is subject in the subsequent trial to all proper objections involving relevancy or competency. *Garrett v. Weinberg,* 54 S. C. 127, 31 S. E. 341 (1898); *Petrie v. Columbia & Greenville R. Co.,* 29 S. C. 303, 7 S. E. 515 (1888); *see* Annot., 159 A. L. R. 119 at 120 (1945); *see also* McCormick, *Evidence,* Section 259 at 770 (3d ed. 1984); *State v. Fredette,* 462 A. (2d) 17 (Me. 1983). Here one of Dr. Ross's two objections to the question was founded on competency; thus, his failure to object to the question when originally asked afforded the trial judge no basis upon which to preclude him from asserting the objection for the first time at the second trial. 88 C. J. S. *Trial* Section 115 at 235 (1955).

Dr. Ross, however, suffered no prejudice in the trial judge's permitting the question. When asked if he had an opinion concerning whether Latreva would have lived had treatment started on July 6, 1979, Dr. Horn replied, "My opinion is that her odds of surviving would have been improved. I cannot say for certain whether she would have survived or not but, statistically, her odds would have been better." As even Dr. Ross recognized in his brief, "Dr. Horn . . . acknowledged that he had no opinion as to whether the deceased child involved in this case would have survived."

Furthermore, the response to the question was cumulative of other testimony received without objection. When cross-examined by Dr. Collings's counsel, Dr. Horn concluded from statistical evidence "that when treatment was begun along four to five days, there's a much lower fatality rate." Dr.

Collings testified that had Latreva been treated Friday evening for Rocky Mountain Spotted Fever he was "sure she would have had a better chance." Dr. Charles P. Darby, an expert called by Dr. Collings, testified that the earlier one obtains treatment for Rocky Mountain Spotted Fever "the better off one is going to be."

As to the objection regarding Dr. Bell's testimony, he was asked if he had an opinion as to whether Latreva would most probably have lived had she been treated for Rocky Mountain Spotted Fever on Thursday, July 5, 1979, by Dr. Ross. An objection identical to that leveled at the question directed to Dr. Horn was sustained by the trial judge. Clark's counsel rephrased the question and asked Dr. Bell without objection whether he had an opinion as to what the odds of Latreva's surviving would have been had she been treated by Dr. Ross on Thursday, July 5, 1979.

Dr. Bell's response indicated the odds would have favored Latreva's survival. As he explained, medical statistics show no fatalities from Rocky Mountain Spotted Fever where treatment occurs earlier than on the fourth day from the onset of symptoms but reveal an approximate two-thirds mortality rate where treatment began on the sixth day or later. His testimony also suggested that Latreva's chance of survival would have been about one in three had she been treated on the fifth day, Friday, July 6, 1979. Elsewhere, Dr. Bell testified that studies show "the incidents [sic] of mortality is about zero percent if treatment is started upon the fourth day or earlier."

Finally, the objections interposed by Dr. Ross to the questions asked Dr. Horn and Dr. Bell did not challenge the admissibility of statistical data concerning the survival rate of Rocky Mountain Spotted Fever victims. Rather, the objections were directed toward the trial judge's permitting each expert witness to express an opinion concerning whether Latreva would have survived had treatment begun on either Thursday, July 5, 1979, or Friday, July 6, 1979.

The trial judge, therefore, committed no error in admitting the statistical evidence.

## II.

Dr. Ross further complains of the restriction placed by the trial court on his right to cross-examine Dr. Horn. His counsel

was not permitted during Dr. Horn's cross-examination to incorporate into a hypothetical question a fact not in evidence but intended for later introduction.

During the first trial, counsel for Dr. Ross asked Dr. Horn to assume hypothetically, among other things, that a six-year-old child, who was taken to a physician, had no history of a tick bite. The trial judge sustained an objection to the hypothetical question because it was based in part on a fact not then in evidence. In doing so, the trial judge dismissed Dr. Ross's argument that in cross-examination a hypothetical question could be partly grounded on an assumed fact when the cross-examiner assures the court the fact will be proved later. As we mentioned, Dr. Horn's former testimony was published at the second trial. Its publication duplicated the alleged error.

The exception argued by Dr. Ross does not involve whether a cross-examiner may propound a hypothetical question that leaves out a fact in evidence assumed in the hypothetical question asked on direct examination. See 31 Am. Jur. (2d) *Expert and Opinion Evidence* Section 60 at 567 (1967). Rather, it expressly involves whether a cross-examiner should be allowed to pose a hypothetical question based in part on a fact that, while not then in evidence, was to be proved later.

The authorites are divided as to whether a hypothetical question asked on cross-examination may assume facts not in evidence. *See* 31 Am. Jur. (2d) *Expert and Opinion Evidence* Section 63 at 570-71 (1967). As we perceive the law in South Carolina, however, the evidentiary facts should ordinarily precede the hypothetical question. *State v. King*, 222 S. C. 108, 71 S. E. (2d) 793 (1952); *Ellis v. Kansas City Life Ins. Co.*, 187 S. C. 334, 197 S. E. 398 (1938). On the other hand, the trial judge in his discretion may permit a hypothetical question to anticipate proof of some of the facts, relying on the assurance of counsel that they will be proved later. *Sligh v. Newberry Electric Cooperative*, 216 S. C. 401, 58 S. E. (2d) 675 (1950); *see Young v. Tide Craft*, 270 S. C. 453, 474, 242 S. E. (2d) 671 (1978) (Ness, J., dissenting).

In our view, the trial court committed no error in disallowing a hypothetical question that assumed a fact to be proved later. We note that the judge, in sustaining the objection to the hypothetical question, expressly reminded counsel that counsel could place Dr. Horn

under subpoena to guarantee his availability and Dr. Horn could be asked the hypothetical question at a later time. Counsel, however, chose not to subpoena Dr. Horn and likewise made no attempt to recall Dr. Horn for the purpose of asking him the hypothetical question in issue. Dr. Ross's complaint concerning the trial court's restriction on his right of cross-examination, therefore, has no merit. *State v. King, supra.*

## III.

Dr. Collings and Dr. Ross both charge the trial court with error in failing to grant their respective motions for involuntary nonsuit, directed verdict, and judgment notwithstanding the verdict. Each physician argues the evidence is insufficient to support a finding either that he was negligent or that any negligence on his part was a proximate cause of Latreva's death. We disagree.

In determining motions made by a defendant for involuntary nonsuit, directed verdict, and judgment notwithstanding the verdict, the evidence and all reasonable inferences that can be drawn therefrom must be viewed in the light most favorable to the plaintiff. *Carter v. Anderson Memorial Hospital,* 325 S. E. (2d) 78 (S. C. App. 1985); *see Hanselmann v. McCardle,* 275 S. C. 46, 267 S. E. (2d) 531 (1980); *Welch v. Whitaker, supra.* A jury's verdict will not be reversed on appeal unless the only reasonable inference that can be drawn from the evidence does not support the factual findings implicit in the verdict. *McGaha v. Mosley,* 322 S. E. (2d) 461 (S. C. App. 1984); *Hall v. Palmetto Enterprises II, supra.*

In a medical malpractice case, a plaintiff must establish both the standard of care and the physician's failure to conform to the required standard. *Botehlo v. Bycura,* 320 S. E. (2d) 59 (S. C. App. 1984); *Welch v. Whitaker, supra, see Green v. Lilliewood,* 272 S. C. 186, 249 S. E. (2d) 910 (1978). In addition to proving the physician negligent, the plaintiff must also prove that the physician's negligence was a proximate cause of the plaintiff's injury. *Hanselmann v. McCardle, supra; Bessinger v. DeLoach,* 230 S. C. 1, 94 S. E. (2d) 3 (1956). A physician's negligence may be deemed a proximate cause of a plaintiff's injury only when without that negligence

the injury either would not have occurred or could have been avoided. *Hughes v. The Children's Clinic, P.A.*, 269 S. C. 389, 237 S. E. (2d) 753 (1977). Ordinarily, the question of proximate cause is one of fact for the jury and the trial judge's sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence. *Carter v. Anderson Memorial Hospital, supra.*

## A.

With these principles in mind, we first examine the ■ evidence offered by Clark against Dr. Collings. We look to see only whether there exists any evidence from which one could reasonably conclude that Dr. Collings was negligent and that his negligence was a proximate cause of Latreva's fatal injury. We do not review the evidence for the purpose of either deciding its truth or determining its weight. *Gladden v. Keistler*, 141 S. C. 524, 140 S. E. 161 (1927); 5 Am. Jur. (2d) *Appeal and Error* Section 882 at 321 (1962).

## 1.

There is ample evidence to support the conclusion that ■ Dr. Collings was negligent in his treatment of Latreva.

The emergency room record, the testimony of Dr. Bell, and the testimony of Dr. Horn supply all the evidence needed to support a finding in this regard.

As we mentioned earlier, Dr. Bell is a pediatrician from New York and Dr. Horn was one of Latreva's treating physicians. Dr. Horn now practices family medicine in Indiana.

Latreva's emergency room record shows that Dr. Collings saw Latreva on Friday, July 6, 1979, at 11:10 p.m. and that she complained of headache and stomach pains. Under the heading entitled "CHIEF COMPLAINT," appears the statement, "had tick on head last week." Under the heading entitled "HISTORY AND PHYSICAL FINDINGS," Dr. Collings recorded, "[f]ever for 5 days," "vomits everything," "[h]ad rash four days," "face . . . bright red" and "won't eat." He further noted that she appeared normal except for the presence of "mild" and "very faint" "erythema macules" and that she "had tick on her last week."

Dr. Bell testified concerning Rocky Mountain Spotted Fever and its symptoms and signs. He related that the principal symptoms and signs of Rocky Mountain Spotted Fever are a fever, rash, and history of a tick bite; that the rash accompanying the disease usually starts on the extremities and spreads to the hands and feet; that Rocky Mountain Spotted Fever is somewhat similar to Fifth's Disease, a viral infection; and that the rash associated with Fifth's Disease never involves the hands and feet.

Dr. Bell also expressed an opinion concerning whether a physician's treatment of a hypothetical child in Latreva's condition on the evening of July 6, 1979, conformed to the required standard of care. He viewed the failure by a physician to admit a hypothetical six-year-old child to the hospital for treatment of Rocky Mountain Spotted Fever as a deviation from the required standard of care where the information regarding the history and physical findings reflected on the emergency room record relating to the hypothetical child was identical to the information regarding the history and physical findings reflected on the emergency room record relating to Latreva.

Dr. Horn testified that when he saw Latreva on Saturday morning, July 7, 1979, he observed a rash on her body, her extremities, her face, and the palms of her hands. He said that he diagnosed her condition as Rocky Mountain Spotted Fever, ordered tests to confirm his clinical diagnosis, and started treatment of the disease.

During his testimony, Dr. Horn pointed out that Rocky Mountain Spotted Fever was endemic to the Anderson area. He also described the symptoms and signs of Rocky Mountain Spotted Fever as including a fever, rash, and history of a tick bite. He added that a headache accompanies the disease as well.

Dr. Horn likewise expressed an opinion regarding a physician's treatment of a hypothetical six-year-old child whose condition was identical to the condition reflected on Latreva's emergency room record. He too testified that he felt it to be a deviation from accepted medical practice for the physician not to admit the hypothetical child to the hospital for treatment of Rocky Mountain Spotted Fever.

## 2.

There is also sufficient evidence to support the conclusion that Dr. Collings's failure to treat Latreva for Rocky Mountain Spotted Fever when he saw her on Friday evening was a proximate, concurring cause of her fatal injury.

Dr. Bell testified concerning whether a physician's failure to treat Latreva for Rocky Mountain Spotted Fever on the fifth day from the onset of symptoms contributed to her death. Dr. Bell further stated that Rocky Mountain Spotted Fever, according to a recent study, is treatable, particularly in its early stages; that statistics indicate no deaths will occur if treatment is begun on the "fourth day or earlier" but if treatment is instituted on the fifth or sixth day fatalities occur in almost two-thirds of all cases; and that the disease should be treated on suspicion because the mortality rate associated with Rocky Mountain Spotted Fever increases dramatically when treatment is delayed.

We think the following quotation from *Hicks v. United States*, 368 F. (2d) 626 at 632 (4th Cir. 1966), a case recently cited with approval by this court in *Coleman v. Shaw*, 281 S. C. 107, 314 S. E. (2d) 154 (S. C. App. 1984), correctly discusses the issue of proximate cause in the context of this case:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possiblity of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized. . . . *Harvey v. Silber*, 300 Mich. 510, 2 N. W. (2d) 483 (1942). [Emphasis theirs.]

Clark was not required to establish to a certainty that Latreva would have lived had Dr. Collings admitted her on Friday evening and begun treating her for Rocky Mountain Spotted Fever. All he needed to prove was that Dr.

Collings's conduct increased the risk of death by significantly decreasing Latreva's chances of survival. *Herskovits v. Group Health Cooperative of Puget Sound,* 99 Wash. (2d) 609, 664 P. (2d) 474 (1983); *Hamil v. Bashline,* 481 Pa. 256, 392 A. (2d) 1280 (1978); *Voegeli v. Lewis,* 568 F. (2d) 89 (8th Cir. 1977); *Daniels v. Hadley Memorial Hospital,* 566 F. (2d) 749 (D. C. Cir. 1977); RESTATEMENT (SECOND) OF TORTS Section 323(a) (1965); *see Coleman v. Shaw, supra; cf. Shropshire v. Jones,* 277 S. C. 468, 289 S. E. (2d) 410 (1982) (quoting and distinguishing Section 323 of the Restatement). The jury could well have concluded from the evidence that Dr. Collings's failure to treat Latreva cancelled whatever chance of recovery she might have had and was a proximate, concurring cause of her death.

### B.

We now examine the evidence offered by Clark against Dr. Ross to determine whether one could infer from the evidence that Dr. Ross was negligent in his treatment of Latreva and whether his negligence was a proximate, concurring cause of Latreva's fatal injury.

### 1.

As in the case of Dr. Collings, sufficient evidence may be found in the record to support the conclusion that Dr. Ross's treatment of Latreva was negligent.

The grandmother testified that she carried Latreva to see Dr. Ross on Tuesday, July 3, 1979, the second day of her illness; that she told the receptionist or nurse "up there in front" that she had removed a tick from Latreva; that the receptionist or nurse wrote as she spoke; that Dr. Ross examined Latreva; that Latreva had a temperature; that Dr. Ross prescribed some medicine for Latreva; that on Wednesday, July 4, 1979, Latreva's condition was no better; that she took Latreva back to Dr. Ross on Thursday, July 5, 1979; that she told Dr. Ross she had "pulled a tick off" Latreva and Latreva had been vomiting; that Latreva had a rash across her chest and on her arms at that time; that Dr. Ross prescribed a cream to spread on the rash; and that no tests were performed by Dr. Ross on Latreva. Dr. Ross's notes regarding Latreva mention that she had "been running [a] temp[erature] for 2 days" and her

temperature was "99.2" the first time he saw her. The entry made by Dr. Ross concerning Latreva's second visit recites, among other things, that she "seems to be worse," that her temperature was "back up around 101-102," and that she had a "rash on face & trunk & upper arms."

Dr. Bell testified that, in his opinion, a hypothetical six-year-old Anderson County child in Latreva's condition and with her history on July 5, 1979, should have been tested further to discover whether anything but Rocky Mountain Spotted Fever caused her illness and that it was a deviation from normal medical practice not to have taken further tests.

2.

Sufficient proof also supports the inference that Dr. Ross's negligence was a proximate, concurring cause of Latreva's injury.

Dr. Ross's only argument regarding proximate cause is that Clark introduced no evidence that Latreva would not have died had treatment for Rocky Mountain Spotted Fever commenced at an earlier time. Clark, however, was not required to prove conclusively that Latreva would not have died had Dr. Ross started treating her for Rocky Mountain Spotted Fever when he saw her on Thursday, July 5, 1979. Clark was required to prove only that Dr. Ross's negligent failure to discover and treat for Rocky Mountain Spotted Fever significantly reduced Latreva's chances for survival. *See, e.g., Herskovits v. Group Health Cooperative of Puget Sound, supra; Hamil v. Bahsline, supra; Hicks v. United States, supra.*

We have referred to the grandmother's testimony that Dr. Ross examined Latreva on the second and fourth days of her illness and we have noted Dr. Bell's testimony that a recent study showed no deaths to result from Rocky Mountain Spotted Fever where treatment of the disease is started on the fourth day of the illness or earlier. We think it reasonable to infer from this evidence that Latreva would not have died from Rocky Mountain Spotted Fever had Dr. Ross tested her for the disease on July 5, 1979, the fourth day of her illness, and had started treatment.

## IV.

By two exceptions, Dr. Collings challenges the failure of the trial judge to grant him a mistrial when publicity regarding the trial appeared in a local newspaper on the second day of the trial. These exceptions have no merit.

First of all, at no time did Dr. Collings ask for a mistrial based on the news article; therefore, the trial judge's failure to grant a mistrial cannot be questioned on appeal. *See Cudd v. John Hancock Mutual Life Ins. Co.,* 279 S. C. 623, 310 S. E. (2d) 830 (S. C. App. 1983); 5 Am. Jur. (2d) *Appeal and Error* Section 612 at 75 (1962).

Secondly, counsel for Dr. Collings requested the trial judge simply "to ask the jury if they read [the news article] and if they've been influenced by it in any way." The trial judge thereupon instructed the jury that if any juror saw the article and was prejudiced by it the juror should report the matter to the foreman so that the juror might then be excused from the case. No objection concerning the manner in which the trial judge complied with counsel's request was made; consequently, Dr. Collings cannot now complain. *See May v. Gentry,* 254 S. C. 243, 174 S. E. (2d) 764 (1970); 4 C. J. S. *Appeal & Error* Section 306 at 947 (1957).

In any case, we discern no prejudice. The trial judge also told the jurors that they would later be asked to base their verdict solely on the evidence presented in court and he cautioned them to disregard anything they might have read about the trial in the newspaper. *See* 5 Am. Jur. (2d) *Appeal and Error* Section 810 at 251 (1962); 76 Am. Jur. (2d) *Trial* Section 1081 at 74 (1975).

## V.

### A.

Dr. Ross seeks a new trial because the trial judge in instructing the jury about proximate cause told them:

> [I]n order for plaintiffs [sic] to recover it must be more probable that the negligence or the malpractice of a physician or both of them was the direct cause of the child dying, that is to say, had the child received treatment is it more probable that she would have survived. . . . If you are not satisfied that the plaintiffs [sic] have proved that even had treatment been begun at an earlier time that the

child would have survived, then, this would not be a proximate cause.

At trial, however, Dr. Ross objected only to that portion of the charge wherein the court stated "had the child received treatment is it more probable that she would have survived." Dr. Ross argued then, as he does now, that the instructions constitute an impermissible comment by the trial judge on the facts in dispute and improperly state the law of proximate cause.

As to the first ground of objection, we do not regard the instructions as a charge on the facts, a practice forbidden by Article V, Section 17 of the South Carolina Constitution. The instructions contain no opinion upon any disputed fact and involve no comment upon the weight of the evidence. *See State v. Mahaffey*, 125 S. C. 313, 118 S. E. 623 (1923); *Enlee v. Seaboard Air Line Ry.*, 110 S. C. 137, 96 S. E. 490 (1918); 75 Am. Jur. (2d) *Trial* Section 664 at 619 (1974).

Regarding the second ground of objection, it is elementary that a trial judge's charge should be considered as a whole [*Manning v. Dial*, 271 S. C. 79, 245 S. E. (2d) 120 (1978)] and that individual portions of a trial judge's charge must be "viewed in the light of and in context with the rest of the charge." *Dickard v. Merritt*, 256 S. C. 458, 465, 182 S. E. (2d) 886, 890 (1971). When the questioned instructions are so considered, no error warranting reversal comes into focus. Prior to making the challenged statement the trial judge correctly defined the term proximate cause to mean "the direct . . . cause" of the injury complained of, here, Latreva's death. *Hughes v. Children's Clinic, P.A.*, *supra*.

Furthermore, the instructions attacked by Dr. Ross merely concern the foreseeability aspect of proximate cause in that the instructions deal only with the probable consequence of either his or his and Dr. Collings's alleged negligence. So viewed, the instructions are not at odds with South Carolina law regarding proximate cause. It has long since been the law in this state that one "may be held liable for anything which appears to have been a natural and probable consequence of his negligence." *Childers v. Gas Lines*, 248 S. C. 316, 325, 149 S. E. (2d) 761, 765 (1966); *Tobias v. Carolina Power & Light Co.*, 190 S. C. 181, 2 S. E. (2d) 686 (1939).

Dr. Ross's complaints concerning a portion of the trial judge's charge, therefore, lack merit.

B.

Dr. Collings argues for a new trial based on jury instructions urging a verdict. The instructions were as follows:

> This has been an extremely expensive case to try on the part of all the parties, the plaintiffs [sic], the defendants. You've seen how many experts have been called in. You've heard references to depositions. Depositions are when you take the testimony outside the court, lawyers are there, court reporters, transcripts. So, I ask you to work together harmoniously to reach a verdict in the case.

Dr. Collings maintains the instructions improperly conveyed the impression to the jury that consideration of litigation expenses outweighed a juror's convictions and required a juror to forego his or her convictions in order to gain the required unanimity.

When urging the jury to decide the case at hand, the trial judge should refrain from saying anything to the jury that is of a coercive nature. *Gaddy v. Harmon,* 191 Ga. 563, 13 S. E. (2d) 357 (1941). In making any remarks designed to impress upon the jury the desirability of reaching a verdict, the trial judge should not employ "language that may fairly be construed as tending to encourage the surrender of conscientious convictions merely for the purpose of agreement." *Terry v. Richardson,* 123 S. C. 319, 326-27, 116 S. E. 273, 275 (1922). Because no general or definite rule exists as to what will constitute coercion in verdict-urging instructions, the particular facts and circumstances determine each case. *Janssen v. Carolina Lumber Co.,* 137 W. Va. 561, 73 S. E. (2d) 12 (1952).

The trial judge's remarks in this instance neither strike us as coercive nor appear in any way harmful.

Before the complained of comments were made, the trial judge carefully instructed the jury that their verdict was to be a "harmonious, unanimous verdict to which everyone can agree [and] which violates no one's conscientious conviction in the case." In addition, after the verdict was published, the jury was polled and each juror responded that the verdict

was his or her own. *See Nickles v. Seaboard Air Line Ry.*, 74 S. C. 102, 54 S. E. 255 (1906); *In re Cocklin's Estate*, 232 Iowa 266, 5 N. W. (2d) 577 (1942); 76 Am. Jur. (2d) *Trial* Section 1067 at 61 (1975).

The trial judge's verdict-urging instructions stressing the expense of litigation, therefore, do not warrant a new trial.

## VI.

Both physicians seek a new trial based on the amount of the verdict. They contend a verdict of $175,000 based on the death of a six-year-old child is so grossly excessive as to indicate that it was the result of sympathy, passion, prejudice, and partiality on the part of the jury.

The physicians rely primarily on *Zorn v. Crawford*, 252 S. C. 127, 165 S. E. (2d) 640 (1969), a case involving the death of a fifteen-year-old girl killed in 1966. In *Zorn*, the Supreme Court struck down a $250,000 verdict for actual damages after concluding it was excessive and unsupported by the evidence. The Court noted the parents sustained no pecuniary loss.

We prefer, however, to follow *Lucht v. Youngblood*, 266 S. C. 127, 221 S. E. (2d) 854 (1976), a more recent case. In *Lucht*, the Supreme Court upheld a $103,000 verdict attacked as excessive. The decedent in *Lucht* was sixteen years old and, like the deceased in *Zorn* and here, unemployed.

Apart from pecuniary loss, Latreva's beneficiaries, her parents, were permitted to recover as damages any mental shock and suffering, wounded feelings, grief and sorrow, loss of companionship and deprivation of the use and comfort of her society sustained by them due to Latreva's death. *Mock v. Atlantic Coast Line R. Co.*, 227 S. C. 245, 87 S. E. (2d) 830 (1955).

In this case, as in *Lucht*, the evidence supports the amount the jury awarded the beneficiaries for their loss. We note from the record Latreva's parents are young adults. Latreva was the oldest of their four children one of whom, a daughter, had died sometime earlier after being struck by a motorist. The evidence paints Latreva's family as middle-class and close-knit and pictures Latreva, who had attended kindergarten, as a beautiful, happy, well-mannered, thoughtful, and active child with many friends. Indeed, Dr. Collings himself described her as "a very sweet, pretty little girl." The damages Latreva's young parents sustained in losing her, including the

jolt of suffering the death of yet another child, no doubt will remain with them the rest of their lives. *See Metropolitan Dade County v. Dillon,* 305 So. (2d) 36 (Fla. App. 1974), *cert. denied,* 317 So. (2d) 442 (1975).

Before we entertained their attack on the verdict, both physicians challenged it before the trial judge. He sustained it. We cannot say he abused his discretion in doing so [*Mock v. Atlantic Coast Line R. Co., supra,* 227 S. C. at 266-68, 87 S. E. (2d) at 839-40 (Legge, J., concurring)], particularly since he, like the jury, heard the evidence and was familiar with the atmosphere at trial. *Lucht v. Youngblood, supra.* Furthermore, the elements of damage in this case involved no tangible items and depended to a substantial degree upon how the jury perceived the beneficiaries and evaluated their testimony. *Id.*

In any case, we must determine not whether we as appellate judges would have set the verdict aside had we presided at trial but whether the amount is so grossly excessive it would be a denial of justice to allow it to stand. *See Dagnello v. Long Island R.R. Co.,* 289 F. (2d) 797 (2d Cir. 1961). Although the verdict is admittedly a large one, we cannot say it is, to use some of the phrases frequently associated with the standard to be employed when testing a verdict for excessiveness, either "monstrous," "shocking to the judicial conscience," [*id* at 802] or "plainly unjust." *Lucht v. Youngblood, supra,* 266 S. C. at 138, 221 S. E. (2d) at 860. We can say, however, that neither physician directed us to either any trial event or any item of evidence that might have caused the jury to base its award on either passion, prejudice, or partiality. *Id.*

The amount of the verdict, therefore, affords the two doctors no basis for a new trial. *Cf. Ahrenholz v. Hennepin County,* 295 N. W. (2d) 645 (Minn. 1980) (where reduced verdict of $100,000 upheld for wrongful death of one-month-old child; *Woods v. Andersen,* 145 Ga. App. 492, 234 S. E. (2d) 748 (1978) (where verdict of $155,000 upheld for wrongful death of six and one-half-year-old child).

## VII.

Finally, both Dr. Collings and Dr. Ross maintain the trial court improperly awarded Clark expenses and attorney fees pursuant to Rule 89(b) of the Circuit Court Rules because of'

their failure to admit a request for admission relating to the cause of Latreva's death.

This case, as we have mentioned, was tried twice. The first trial, presided over by the Honorable Clyde A. Eltzroth, resulted in a mistrial. The Honorable Walter T. Cox, Jr., presided over the second trial. Prior to each trial, Clark served upon the two physicians the following request for admission:

> Do you admit that [Latreva] died on July 7, 1979 due to or from complications arising from Rocky Mountain Spotted Fever?

Neither Dr. Collings nor Dr. Ross admitted the request.

After both physicians failed to admit Clark's initial request for admission, Clark's counsel deposed Dr. Philip Lynch, the pathologist who performed the autopsy on Latreva's body. Dr. Lynch testified that in his opinion Latreva's death was caused by complications consistent with Rocky Mountain Spotted Fever. He was unable to provide a laboratory diagnosis as to the cause of Latreva's death because blood tissues sent to the State Laboratory were not received by it in a usable state.

Dr. Lynch's deposition was published at the second trial. Apparently, it was used at the first trial as well.

Following the first trial, Clark's counsel orally moved pursuant to Rule 89(b) for an order requiring both physicians to pay him the reasonable expenses, including attorney fees, Clark incurred in proving the cause of Latreva's death. Judge Eltzroth, without affording the physicians any opportunity to contest the amounts sought by Clark, awarded Clark expenses and attorney fees totalling $2,396.40. Judge Eltzroth based this amount upon an unserved affidavit submitted by one of Clark's attorneys.

After the second trial, Clark's counsel again moved pursuant to Rule 89(b) for an award of reasonable expenses and attorney fees incurred by Clark in proving the cause of Latreva's death. Judge Cox required Clark's counsel to submit a formal request itemizing the expenses Clark sought. He directerd the request to be served upon opposing counsel and told the latter they could challenge the amounts requested if they chose. Judge Cox thereafter awarded Clark $1,041.40 in expenses and $500 in attorney fees.

In South Carolina, a party requesting another party to admit facts stated in a request, on the denial of the request, may prove the facts and later apply to the trial court "for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees." S. C. CIR. CT. R. 89(b). The requesting party is entitled to recover his expenses unless the trial court finds "(1) a request was held objectionable pursuant to subdivision (a) of [Rule 89], or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that he might prevail on the matter, or (4) there was other good reason for the failure to admit." *Id.*

Neither physician contends that either Subsection (1), Subsection (2) or Subsection (3) of Rule 89(b) is applicable to the orders under attack. They seek to avoid liability for Clark's expenses in proving the cause of Latreva's death solely on the basis of Subsection (4). They argue that Dr. Lynch "could not definitively testify that [Latreva] did, in fact, died of Rocky Mountain Spotted Fever" because "laboratory tests did not show that Rocky Mountain Spotted Fever was the cause of death."

The exercise by a trial court of its discretionary powers with respect to sanctions imposed in discovery matters will be interferred with by the Court of Apeals only if an abuse of discretion has occurred. *Routh v. Weaver,* 67 N. C. App. 426, 313 S. E. (2d) 793 (1984); *Nixon v. Sandy Springs Fitness Center, Inc.,* 167 Ga. App. 272, 306 S. E. (2d) 362 (1983). The party appealing from an order imposing sanctions in discovery matters has the burden of proving the trial court abused its discretion. 5A C. J. S. *Appeal & Error* Section 1594 at 72 (1958).

While it is true that Dr. Lynch could not "definitively testify" that Latreva's death resulted from complications caused by Rocky Mountain Spotted Fever, he did give a firm opinion that she so died. Neither Dr. Collings nor Dr. Ross points us to any evidence offered by him during either trial that Latreva did not die from complications resulting from Rocky Mountain Spotted Fever. We cannot hold, therefore, that either Judge Eltzroth or Judge Cox abused his discretion in allowing Clark to recover the expenses he incurred in gathering proof concerning the cause of Latreva's death.

Judge Eltzroth did err, however, in awarding to Clark the sum of $2,396.40 as expenses and attorney fees. The amount was improperly based on an unserved affidavit and taxed against Dr. Collings and Dr. Ross without their being afforded an opportunity to question the affidavit and the information it contained. *See* 20 C. J. S. *Costs* Section 262 at 495 (1940); *cf. Lowndes Products, Inc. v. Brower*, 259 S. C. 322, 191 S. E. (2d) 761 (1972), *appeal after remand*, 262 S. C. 431, 205 S. E. (2d) 184 (1974) (trial court's award of attorney fees to defendants reversed where plaintiff not given opportunity to contest the issue). We therefore reverse the amount awarded as expenses and attorney fees by Judge Eltzroth and remand the issue concerning the amount for redetermination.

Finally, Dr. Ross argues that Judge Cox's order is invalid because he undertook "to review" Judge Eltzroth's order "on the same issue." This contention has no merit. As we read Judge Cox's order, he simply referred to Judge Eltzroth's order to determine whether he ought to adopt its reasoning and be guided by it in deciding a similar but different motion. Judge Cox did not err in doing so. *See Sheppard v. Kimbrough*, 318 S. E. (2d) 573 (S. C. App. 1984). Judge Cox's order is therefore affirmed.

For all of the foregoing reasons the judgment appealed from is

Affirmed in part, reversed in part, and remanded.

Shaw and Cureton, JJ., concur.