**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Lawrence Keeter, Ronald Travis Keeter, and Rebecca Keeter, Appellants/Respondents,

v.

Alpine Towers International, Inc., and Ashley Sexton, Defendants,

Of Whom Alpine Towers International, Inc., is Respondent/Appellant.

Appellate Case No. 2009-137246

Appeal From York County
John C. Hayes, III, Circuit Court Judge

Opinion No. 2012-UP-692
Heard December 6, 2011 – Filed June 27, 2012

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

Richard A. Harpootlian and Graham L. Newman, both of Richard A. Harpootlian, P.A., of Columbia, for Appellants/Respondents.

Charles E. Carpenter, Jr., and Carmon V. Ganjehsani, of Carpenter Appeals & Trial Support, LLC, of Columbia,

and Thomas C. Salane, of Turner, Padget, Graham & Laney, P.A., of Columbia, for Respondent/Appellant.

**FEW, C.J.:** Lawrence "Larry" Keeter and his parents brought this action against Alpine Towers International, Inc., for strict liability, negligent design, and negligent training after Larry broke his back and became a paraplegic as a result of a fall to the ground from a climbing tower designed, manufactured, and installed by Alpine Towers.  The jury awarded actual and punitive damages in favor of Larry and actual damages in favor of his parents for Larry's medical bills.  After both sides filed post-trial motions, the trial court entered separate judgments in favor of Larry and his parents.  Alpine Towers appeals the trial court's decision to deny its motions for directed verdict and judgment notwithstanding the verdict (JNOV) as to actual and punitive damages, and its motion for a new trial due to an alleged error as to apportionment.  Larry appeals the trial court's ruling requiring him to elect between his three causes of action.  We affirm the denial of Alpine Towers' motions.  However, we hold the trial court incorrectly interpreted the jury's verdict and erred in requiring Larry to elect.  We remand to the trial court with instructions to enter judgment in Larry's favor against Alpine Towers in the amount of $3,400,500.00 actual damages and $1,110,000.00 punitive damages.[1]

## I.        Facts

On May 5, 2006, the senior students at Fort Mill High School (Fort Mill) participated in a spring fling recreational field day.  During field day, Larry fell more than twenty feet from the climbing tower to the ground.  When he hit the ground, Larry broke a vertebra and was rendered a permanent paraplegic.  He was seventeen.

Alpine Towers originally sold the climbing tower to Carowinds amusement park near Charlotte, North Carolina.  Fort Mill bought the tower from Carowinds in July 2004 and hired Alpine Towers to move it, install it, and train Fort Mill's faculty to safely use it.  Fort Mill's contract with Alpine Towers identifies Alpine Towers as "seller" and provides: "Installation includes all hardware, materials, . . . labor, . . . design work, . . . and staff training."  The wooden climbing tower is fifty feet tall, has three sides, and is shaped liked an hourglass.  The central safety feature of any

---

[1] The judgment in favor of Larry's parents is not affected by this appeal.

climbing tower is the belay system.[2] Alpine Towers designed the belay system on this climbing tower to include four participants—the climber, a primary belayer, a back-up belayer, and a faculty supervisor. The system requires the climber to wear a harness, which is secured to a climbing rope. The rope passes through a pulley at the top of the tower and down to a belay device secured to the ground at the base of the tower. The rope is threaded through the belay device, which uses bends in the rope to create friction to control the speed at which the rope passes through the device. As the climber ascends, the belayer guides the rope through the belay device to keep the rope taut. If the climber falls from the tower while climbing, the belayer uses the friction the belay device creates on the rope to keep the rope from passing back through the device, and thus protects the climber from falling all the way to the ground.

After a successful climb, or in the event the climber falls before completing the climb, the belayer lowers the climber to the ground in a controlled fashion by guiding the rope back through the belay device. The friction created on the rope allows the belayer to control the speed of the climber's descent.[3] Because of the hourglass shape of the tower, a climber being lowered to the ground by the belayer is suspended in air, away from the side of the tower.

Ashley Sexton, a senior at Fort Mill, served as Larry's primary belayer. Fort Mill trained Ashley to belay as a part of the Junior ROTC program. Larry had never been trained in belaying or climbing, but successfully climbed to the top of the tower. Ashley testified that while she was lowering Larry to the ground "the rope . . . got[] tight in the [belay device] almost as if it were stuck" and would not move. Neither Ashley nor anyone at Fort Mill had been taught what to do if the rope became stuck in the belay device. When Ashley tried to free the rope, she lost the assistance of the device, was unable to control the rope, and Larry fell more than twenty feet to the ground.

---

[2] Alpine Towers' instruction manual defines "belay" as "the rope or technique . . . that is used to protect a climber from falling to the ground." *See also Merriam-Webster Collegiate Dictionary* 111 (11th ed. 2004) (defining belay as "the securing of a person or a safety rope to an anchor point (as during mountain climbing)").

[3] Alpine Towers' CEO explained that "not very much" strength is required to hold a climber in the air because the weight is transferred through the belay device to the rope attached to the ground, so that a lightweight belayer can easily lower even a heavy climber.

Alpine Towers designed the belay system on the climbing tower and trained Fort Mill's faculty how to use it. Alpine Towers provided no notice or warning to Fort Mill's faculty that the climbing rope could get stuck in the belay device it designed into the system. Alpine Towers also provided no training or instruction on how the belayer or faculty supervisor should handle the situation if it did. Alpine Towers chose not to incorporate into the design a readily available, automatically locking belay device Larry's experts testified would have stopped Larry's fall. Alpine Towers did not train Fort Mill's faculty to require the faculty supervisor to stand directly beside the belayer, which Alpine Towers admitted at trial should always be done to ensure that proper procedures were followed in the climb and to assist the belayers in the event of a situation like the one that resulted in Larry's fall. When Larry fell, no back-up belayer was present, and no faculty supervisor was close enough to assist Ashley.

## II.        Procedural History

All of Larry's damages were caused by the broken back he suffered as a result of his fall. Larry asserted three causes of action presenting three alternative theories of Alpine Towers' liability for those damages: (1) Alpine Towers was strictly liable for the manufacture and sale of a defective and unreasonably dangerous product; (2) Alpine Towers negligently designed the climbing tower without adequate safety equipment, instructions, and warnings;[4] and (3) Alpine Towers was negligent in failing to properly train Fort Mill's faculty on how to safely use the climbing tower, particularly in failing to train the faculty to teach student belayers to safely use the belay system.

Larry also filed suit against Ashley for negligence. Larry's parents filed suit against Alpine Towers and Ashley for Larry's medical bills. Larry and his parents settled with Fort Mill before filing suit and dismissed Ashley as a defendant before trial. The jury returned a verdict for Larry on each cause of action. It awarded $500.00 for strict liability,[5] $900,000.00 in actual damages and $160,000.00 in

---

[4] Because Alpine Towers did the "design work" for the installation of the tower at Fort Mill, Larry's negligent design theory includes allegations of negligence in failing to design the tower to meet the specific safety needs of Fort Mill.

[5] The jury originally returned a verdict on the strict liability cause of action in favor of Larry, but with zero damages. After the trial court instructed the jury that it must either award damages to Larry or find in favor of Alpine Towers, it returned a $500.00 award.

punitive damages for negligent design of the tower, and $2,500,000.00 in actual damages and $950,000.00 in punitive damages for Alpine Tower's negligence in training Fort Mill's faculty.  The jury also returned a verdict for Larry's parents for $240,000.00 in actual damages.

Alpine Towers filed a post-trial motion seeking (1) judgment notwithstanding the verdict as to all causes of action and punitive damages, (2) a new trial, (3) an order requiring Larry to elect between the three causes of action, (4) set-off of the settlement paid by Fort Mill, and (5) apportionment under the Contribution Among Joint Tortfeasors Act.  The trial court denied the JNOV, new trial, and apportionment motions.  The court required Larry to elect between his causes of action and ordered that the settlement from Fort Mill be set-off against Larry's recovery from Alpine Towers.  Larry also filed a post-trial motion asking the trial court to enter judgment in the cumulative amount of the damage awards rather than require him to elect.  The court denied Larry's motion and ordered that judgment be entered in the amount of $2,500,000.00 in actual damages and $950,000.00 in punitive damages on the negligent training cause of action.

### III.        Alpine Towers' Appeal

#### A.       Directed Verdict and JNOV—Actual Damages

"In ruling on motions for directed verdict and JNOV, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions." *McMillan v. Oconee Mem'l Hosp., Inc.*, 367 S.C. 559, 564, 626 S.E.2d 884, 886 (2006).  "When we review a trial judge's . . . denial of a motion for directed verdict or JNOV, we reverse only when there is no evidence to support the ruling or when the ruling is governed by an error of law." *Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 42, 691 S.E.2d 135, 145 (2010).

In its motions for directed verdict and JNOV, Alpine Towers contested all liability issues, including the sufficiency of the evidence supporting each of Larry's causes of action.  In its Statement of Issues on Appeal, Alpine Towers contends only that the trial court should have granted its motions because the chain of causation was broken as a matter of law.  Specifically, Alpine Towers contends the chain of causation was broken by (1) "the intervening and superseding negligent acts of Fort Mill High School and Ashley Sexton in failing to follow the warnings, directions, and instructions for proper use of the Tower" and (2) "the intervening and superseding negligent acts of Fort Mill High School in failing to undertake its

independent duty to properly supervise its students."  However, because both Larry and Alpine Towers address in their briefs the sufficiency of the evidence supporting each of Larry's causes of action, we do as well.  We find ample evidence to support the jury's verdict as to each.  We also find ample evidence that Ashley's negligence and any negligence by Fort Mill was foreseeable to Alpine Towers, and thus their negligence does not break the chain of causation from Alpine Towers' tortious conduct.

### 1.    Strict Liability

In his strict liability theory, Larry focused on Alpine Towers' design of the climbing tower to incorporate a belay device called Trango Jaws.  The Trango Jaws is operated manually and requires the belayer to properly position the climbing rope in the Trango Jaws to create the friction necessary to stop the rope and then control the rate of the climber's descent.  Larry's expert witness in biomechanics and sports safety, Gerald George, Ph.D., testified that the Trango Jaws relies on the absence of human error to safely belay a climber.  He explained that it was feasible to use an alternative design for the climbing tower incorporating a belay device called a GriGri.[6]

The GriGri is a mechanical device that, when properly threaded, does not rely on the absence of human error.  In the event the belayer loses control of the rope, the GriGri automatically stops the rope, and thus protects the climber from falling to the ground.  Larry's climbing wall safety expert, Dan Hague, testified that the GriGri "locks up automatically, . . . you're not relying on the actions of the belayer to lock the device up."  He emphasized that the automatic stopping feature of the GriGri is particularly important when students are belaying climbers because of the heightened likelihood of human error.  To account for this foreseeable risk, Hague "always uses the GriGri with kids."  In Hague's opinion, "this injury would not have occurred had a GriGri been in use that day."  As a normal part of its business, Alpine Towers sells the GriGri for a variety of uses, including on its own climbing towers.  Dr. George testified that without incorporating a "fail-safe" belay device such as the GriGri into the design of a climbing tower used for students, the climbing tower is defective and unreasonably dangerous.

---

[6] The GriGri costs approximately $75, and the Trango Jaws costs approximately $24.  The CEO of Alpine Towers testified the difference in cost is an "inconsequential amount of money."

Alpine Towers' argument that the evidence in support of Larry's strict liability cause of action is insufficient is that there is no evidence the tower "was in a defective condition, unreasonably dangerous to the user . . . when it left the hands of the defendant." *See Bragg v. Hi-Ranger, Inc.*, 319 S.C. 531, 539, 462 S.E.2d 321, 326 (Ct. App. 1995). However, the evidence discussed above amply supports the jury's finding that it was. Moreover, the GriGri qualifies as a "reasonable alternative design" as required under *Branham v. Ford Motor Co.*, 390 S.C. 203, 225, 701 S.E.2d 5, 16 (2010). The trial court correctly denied Alpine Towers' directed verdict and JNOV motions as to strict liability.

### 2. Negligent Design

"A negligence theory imposes the additional burden on a plaintiff 'of demonstrating the defendant . . . failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault.'" *Branham*, 390 S.C. at 210, 701 S.E.2d at 9 (quoting *Bragg*, 319 S.C. at 539, 462 S.E.2d at 326). In his negligent design theory, Larry also relied on the evidence that Alpine Towers should have used the GriGri in designing a climbing tower to be used by students, particularly student belayers. However, in addition to evidence that the tower was defective and unreasonably dangerous without the GriGri, Larry presented evidence that Alpine Towers failed to exercise reasonable care in the design. Specifically, Larry presented evidence that Alpine Towers conducted a ten-year study ending in 1999 that concluded the majority of accidents on its climbing towers were caused by human error, specifically belayers dropping their climbers. Despite this knowledge, Alpine Towers chose not to design for human error by including a belay device that would automatically lock and prevent the rope from passing back through the device, thus preventing a fall to the ground such as the one Larry suffered.

Moreover, Larry's experts testified to several breaches of Alpine Towers' duty of reasonable care in designing the warnings and instructions on the tower. In particular, Larry's experts testified faculty supervisors should be instructed to remain within reaching distance of active belay ropes. Alpine Towers' employee John Mordhurst conceded this instruction was necessary. Mordhurst testified a faculty supervisor should be at each belay point, and "[t]hey should be . . . in a position to intervene to grab a rope, . . . so they should be right next to the belayers and belay monitors." In the 1997 edition of Alpine Towers' instruction manual for the climbing tower, the section entitled "The Belay System" includes this requirement: "[P]rograms should require staff to check the belayer's and climber's

systems prior to climbing and lowering; . . . the staff member should stand directly beside the climber." However, Alpine Towers omitted the statement containing this requirement from the 2004 edition of the instruction manual, the edition it provided to Fort Mill.

Additionally, Dr. George testified Alpine Towers should have placed end user warnings on the tower for someone like Larry, who climbed for the first time without any instruction, and Ashley, who never received an instruction manual. Dr. George explained this was necessary to ensure an inexperienced climber such as Larry will know the dangers of climbing and understand how the belay system is designed to work before deciding to begin a climb. This evidence amply supports the jury's finding that Alpine Towers failed to exercise reasonable care in designing a defective and unreasonably dangerous climbing tower. Therefore, the trial court was correct to deny Alpine Towers' motions as to negligent design.

### 3. Negligent Training

In his negligent training theory, Larry presented evidence that despite knowing Fort Mill's faculty would not be doing most of the belaying, but rather would be teaching students to belay, Alpine Towers did not instruct the faculty how to teach belaying. Larry proved several key facts in support of this claim. First, Alpine Towers uses a written syllabus when it conducts classes to teach adults how to belay. However, it did not provide the syllabus to Fort Mill to enable Fort Mill to effectively teach students. Second, the belay system designed by Alpine Towers relies on a faculty supervisor to ensure the students are properly belaying the climbers. In addition to Mordhurst's testimony as to where the faculty supervisor should be positioned, the CEO of Alpine Towers, Joe Lackey, testified, "the staff member should stand directly behind the climber, . . . not thirty feet away." The obvious purpose of this requirement is to enable the supervisor to keep the students from making errors and, if they do, to prevent the tragic consequences Larry suffered. However, Larry presented evidence that Alpine Towers did not teach this to the faculty at Fort Mill. One member of Fort Mill's faculty who attended the Alpine Towers course testified he did not recall being told that a faculty supervisor should stand beside the belayer. When asked why the requirement that "the staff member should stand directly beside the climber" in the 1997 instruction manual was not included in the 2004 edition, Lackey responded, "I'm not sure why it was taken out."

Moreover, despite knowing that Fort Mill would be teaching students to belay and that students were more susceptible to making belaying errors than adults, Alpine

Towers did not teach Fort Mill that it should test the students' competency before allowing them to belay a climber. Hague testified "as a matter of course in my industry, participants are tested," including whether they are "able to . . . belay in a competent manner, catch falls, lower somebody . . . off a climb." He explained:

> In a climbing setting you have to be able to assess whether or not the group as a whole is making progress. . . . Since we're talking about life safety here and not about math, if someone is not learning at the same rate as the group, you can't just move to the next topic. You have to slow down. You have to be able to address that one person until everybody's caught up. In addition, at the end of the training, there needs to be some type of discrete competency test.

Alpine Towers has several employees who serve on the standards committee for the Association for Challenge Courses Technology, which Lackey called a "climbing society." Despite evidence of this standard climbing industry practice, Alpine Towers did not teach Fort Mill that it needed to test, how the tests should be conducted, or what particular skills should be tested.[7]

This evidence provides ample support for the jury's finding that Alpine Towers was negligent in failing to properly train the Fort Mill faculty on how to safely use the tower, and thus the trial court properly denied Alpine Towers' motions as to negligent training.

We affirm the trial court's decision to deny Alpine Towers' motions for directed verdict and JNOV as to the sufficiency of the evidence supporting all three of Larry's causes of action.

### 4.    Intervening Causation

---

[7] Ashley testified she was not given a written test, but was required to do a "demonstration" and be watched by a faculty member to make sure she "knew how to do it." There was no evidence, however, that Alpine Towers took any steps to ensure Fort Mill gave an adequate test of her competency. In fact, Alpine Towers' instruction manual says only that students "will demonstrate proficiency in belaying before being permitted to belay."

The test for whether a subsequent negligent act by a third party breaks the chain of causation to insulate a prior tortfeasor from liability is whether the subsequent actor's negligence was reasonably foreseeable. "For an intervening act to break the causal link and insulate the tortfeasor from further liability, the intervening act must be unforeseeable." *McKnight v. S.C. Dep't of Corr.*, 385 S.C. 380, 387, 684 S.E.2d 566, 569 (Ct. App. 2009) (internal quotation marks omitted). The trial court properly charged the jury as follows:

> The chain of causation between a defendant's negligence and the injury itself may be broken by the independent intervening acts or omissions of another person over whom the defendant had no control. In order to decide whether an intervening act breaks the chain of causation, you must determine whether the intervening act or omission was reasonably foreseeable by the defendant. If the intervening act or omission was a probable consequence of the defendant's negligence, the defendant is responsible for the plaintiff's injuries. If, however, you find that the intervening act or omission was not foreseeable, the defendant is not liable.

By finding in favor of Larry, the jury necessarily found the actions of Ashley and Fort Mill were foreseeable, and therefore the chain of causation was not broken to insulate Alpine Towers from liability. There is ample evidence to support this finding. *See Cody P. v. Bank of Am., N.A.*, 395 S.C. 611, 621-22, 720 S.E.2d 473, 479 (Ct. App. 2011) ("Only in rare or exceptional cases may the question of proximate cause be decided as a matter of law. . . . If there may be a fair difference of opinion regarding whose act proximately caused the injury, then the question of proximate cause must be submitted to the jury." (internal quotation marks and citations omitted)).

Larry presented evidence that Alpine Towers knew Fort Mill would be using high school students to belay climbers, that adolescents are more susceptible to belaying errors than adults, and that Alpine Towers conducted a study concluding human error is the most common cause of falls to the ground from climbing towers. Dr. George testified Alpine Towers "knew or should have known . . . of these risks." He stated it was not merely foreseeable, but "almost predictable," that high school students would not follow proper procedures for belaying climbers. Hague testified that he has trained "thousands and thousands" of people in belaying over fifteen years, including "many hundreds" of adolescents, he takes different

approaches to training depending on the maturity level of the belaying student, adolescents "routinely do not" follow procedures, and Alpine Towers "could easily foresee that adolescents aren't going to follow all the procedures."

Therefore, the primary risk associated with the use of a climbing tower is that the belayer, back-up, or faculty supervisor might make an error belaying the climber. Each of Larry's theories of recovery focused on the allegation that Alpine Towers failed to design for and train against human error in belaying and the supervision of students belaying. This is not a "rare or exceptional" case in which the issue of proximate cause may be decided as a matter of law. Alpine Towers' argument that "the intervening and superseding negligent acts of Fort Mill High School and Ashley Sexton" broke the chain of causation fails because there is ample evidence in the record that precisely the same human error that resulted in Larry's injury was not only foreseeable to Alpine Towers, but was actually foreseen. Accordingly, we find the trial court properly submitted the question of proximate cause to the jury, and we affirm its decision to deny Alpine Towers' motions for directed verdict and JNOV as to intervening causation.

### B.     Directed Verdict and JNOV—Punitive Damages

Alpine Towers also argues the trial court erred in denying its directed verdict and JNOV motions as to punitive damages. We disagree.

"When ruling on a directed verdict motion as to punitive damages, the circuit court must view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party." *Hollis v. Stonington Dev., LLC*, 394 S.C. 383, 393-94, 714 S.E.2d 904, 909 (Ct. App. 2011) (internal quotation marks omitted). This court applies the same standard as the circuit court. 394 S.C. at 394, 714 S.E.2d at 910. "The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless . . . ." *Mishoe v. QHG of Lake City, Inc.*, 366 S.C. 195, 201, 621 S.E.2d 363, 366 (Ct. App. 2005). "Recklessness implies the doing of a negligent act knowingly; it is a conscious failure to exercise due care. If a person of ordinary reason and prudence would have been conscious of the probability of resulting injury, the law says the person is reckless . . . ." *Berberich v. Jack*, 392 S.C. 278, 287, 709 S.E.2d 607, 612 (2011) (internal citation and quotation marks omitted).

Larry made two separate claims for punitive damages against Alpine Towers: (1) for reckless behavior in its design of the climbing tower and (2) for reckless

behavior in its failure to properly train the Fort Mill faculty on how to safely use the climbing tower. The jury awarded punitive damages on each claim, so we address each independently.

As to Larry's claim for punitive damages based on Alpine Towers' reckless behavior in designing the tower, Larry presented evidence that Alpine Towers knew the majority of accidents occurring on its climbing towers were caused by human error by belayers and back-up belayers. Mordhurst conceded that of the three options for a belay device in the design of a climbing tower, "the GriGri has [the] highest likelihood of arresting the fall" of a climber and thus protecting him from falling to the ground if the belayer loses control of the rope. Lackey testified the additional cost of a GriGri is "inconsequential." Alpine Towers' decision to design its climbing tower to incorporate the Trango Jaws instead of the GriGri under these circumstances is sufficient evidence Alpine Towers was "conscious of the probability of resulting injury" from its negligence, and therefore was reckless. The trial court was correct to submit the issue of punitive damages for reckless design to the jury. 392 S.C. at 287, 709 S.E.2d at 612.

As to Larry's claim for punitive damages based on Alpine Towers' reckless behavior in failing to properly train the Fort Mill faculty, in addition to the evidence discussed above, Alpine Towers knew Fort Mill would be using student belayers, whom Alpine Towers knew to be less attentive to following procedures and more susceptible to errors in belaying than adults. Nevertheless, Alpine Towers (1) chose not to train Fort Mill's faculty to teach others, particularly students; (2) did not include in the training materials given to Fort Mill the syllabus Alpine Towers uses to teach belaying; (3) removed from its training manual the specific instruction for faculty supervisors to "stand directly behind the climber"; (4) did not teach Fort Mill to follow the industry practice of testing belayers on the basic skills of belaying before allowing them to belay climbers; and (5) did not inform Fort Mill it had the option of an automatically locking belay device such as the GriGri to compensate for the greater risk posed by the use of student belayers. This also is sufficient evidence Alpine Towers was "conscious of the probability of resulting injury" from its negligence, and therefore was reckless. The trial court was correct to submit the issue of punitive damages for reckless training to the jury. *Id.*

Accordingly, we affirm the trial court's decision to deny Alpine Towers' directed verdict and JNOV motions as to punitive damages.

### C.    Apportionment of Fort Mill's Fault

Alpine Towers contends it is entitled to a new trial because the trial court did not allow the jury to consider the fault of Fort Mill when it apportioned fault under section 15-38-15 of the South Carolina Code (Supp. 2011).[8] However, our ruling affirming the jury's award of punitive damages makes it unnecessary to address this issue as the apportionment statute "does not apply to a defendant whose conduct is determined to be . . . reckless." § 15-38-15(F).

## IV.    Larry's Appeal

Larry appeals the trial court's post-trial ruling entering judgment in his favor in the amount of $2,500,000.00 in actual damages and $950,000.00 in punitive damages. He contends the trial court erred in interpreting the verdicts as "three awards" and requiring him to elect which cause of action would be his remedy. We agree.

"Election of remedies involves a choice between different forms of redress afforded by law for the same injury . . . . It is the act of choosing between inconsistent remedies allowed by law on the same set of facts." *Taylor v. Medenica*, 324 S.C. 200, 218, 479 S.E.2d 35, 44-45 (1996). Larry asserted three causes of action, but sought only one remedy—damages—for only one injury—a broken back. When a plaintiff seeks only one remedy, there is nothing to elect. *See Adams v. Grant*, 292 S.C. 581, 586, 358 S.E.2d 142, 144 (Ct. App. 1986) ("Where a plaintiff presents two causes of action because he is uncertain of which he will be able to prove, but seeks a single recovery, he will not be required to elect.").

The trial court in this case recognized that Larry's three causes of action sought only one remedy. In its post-trial order, the court wrote:

> Here, both products liability claims and the negligence claim represent three theories for recovery for the same injury and damages—personal injuries sustained by [Larry] in his fall. [Larry] had one fall and all his injury and damages flow therefrom regardless of the number of acts of omission or commission of [Alpine Towers].

---

[8] After the jury's verdict as to liability, the trial court required it to apportion fault between Alpine Towers and Ashley. The jury determined that Ashley was 60% at fault and Alpine Towers was 40% at fault. The jury was not asked to consider the fault of Fort Mill.

Because Larry sought only one remedy, the doctrine of election of remedies does not apply. "As its name states, the doctrine applies to the election of 'remedies' not the election of 'verdicts.'" *Austin*, 387 S.C. at 57, 691 S.E.2d at 153 (defining a "'remedy' as '[t]he means by which . . . the violation of a right is . . . compensated.'" (quoting *Black's Law Dictionary* 1163 (5th ed. 1979))).

This court addressed a similar situation in *Creach v. Sara Lee Corp.*, 331 S.C. 461, 502 S.E.2d 923 (Ct. App. 1998). The plaintiff in *Creach* "bit down on a hard substance in a steak biscuit made by Sara Lee Corporation," "experience[d] severe pain," and had to undergo "extensive dental work." 331 S.C. at 463, 502 S.E.2d at 923-24. She sued Sara Lee and others "alleging negligence, breach of warranty, and strict liability." 331 S.C. at 463, 502 S.E.2d at 923. After a verdict for Creach on all three causes of action, Sara Lee asked the trial judge to require her to elect her remedy. The judge refused to do so, and this court affirmed, holding "while the complaint stated three different causes of action, only one recovery was sought and only one recovery was awarded. Under these circumstances, no election was required." 331 S.C. at 464, 502 S.E.2d at 924 (citing *Taylor*, 324 S.C. at 218, 479 S.E.2d at 44-45). *Creach* supports our holding that because Larry sought one remedy for one injury, the trial court erred in requiring him to elect.

Nevertheless, the trial court and this court must ensure that Larry does not receive a double recovery. *See Collins Music Co. v. Smith*, 332 S.C. 145, 147, 503 S.E.2d 481, 482 (Ct. App. 1998) ("It is well settled in this state that there can be no double recovery for a single wrong and a plaintiff may recover his actual damages only once." (internal quotation marks omitted)). The determination of whether a verdict grants a double recovery begins with the trial court's responsibility to interpret the verdict in order to ascertain the jury's intent. The trial court interpreted the jury's verdict in this case to be "three awards," and therefore "inconsistent" because it allowed Larry a double recovery. We find the trial court erred in its interpretation of the verdict.

The error arose from the verdict form. Because Larry asserted three causes of action, the trial court correctly fashioned the verdict form to require the jury to write its verdict for each cause of action. However, because Larry sought only one remedy—damages—and because the amount of those damages could not vary from one cause of action to another, the trial court should have required the jury to write one amount for Larry's actual damages, and should not have permitted the jury to write a damages amount for each of the three causes of action. The use of

the three blanks for damages in the verdict form left the verdict ambiguous as to the amount of damages the jury intended to award.

To determine the jury's intent in an ambiguous verdict, the court should consider the entire proceedings, focusing on the events and circumstances that reasonably indicate what the jury intended. *See Durst v. S. Ry. Co.*, 161 S.C. 498, 506, 159 S.E. 844, 848 (1931) (stating "the construction of a verdict should, and can, depend upon, not only the language used by the jury, but other things occurring in the trial may be, and should be, properly regarded in determining what a jury intended to find"); *Howard v. Kirton*, 144 S.C. 89, 101, 142 S.E. 39, 43 (1928) (stating it is "the duty of the trial judge to decide what the verdict meant, and, in reaching his conclusion thereabout, it was his duty to take into consideration not only the language of the verdict, but all the matters that occurred in the course of the trial"); *see also* 75B Am. Jur. 2d *Trial* § 1545 (2007) ("In the interpretation of an ambiguous verdict, the court may make use of anything in the proceedings that serves to show with certainty what the jury intended, and, for this purpose, reference may be had, for example, to the pleadings, the evidence, the admissions of the parties, the instructions, or the forms of verdict submitted.").

To correctly interpret the verdict in this case, the trial court was required to consider several indications of the jury's intention as to damages. First, the court should have considered its own conclusion that Larry sought only one remedy—damages—and that all of his damages flowed from the broken back resulting from his fall from the tower. Thus, it was not possible for the damages to vary from one cause of action to another. Second, after the jury returned the verdicts, Larry made a motion asking the court to inquire of the jury whether it meant for the damages awarded to be cumulative. Alpine Towers did not object to the request. While the jury was still in the courtroom, the judge asked the forelady if the jury intended the verdicts to be cumulative.

> The Court: . . . Before you leave, I've got one last question. On the three causes of action you have awarded different amounts of damages. . . . Was it the jury's intention to award those cumulatively, that is they add up to [$3.4 million and $500.00] . . . or did you simply mean that the damages as to each cause of action were to be separate . . . .
>
> Forelady: Ask me that again.

. . .

The Court: . . . You have ordered [$500.00] on one, [$900,000.00] on one, and [$2.5 million] on one. Is it the jury's intention that those are to be added, that is cumulative, or is the jury's intention that as to each cause of action that award applies only to that cause of action?

Forelady: It's cumulative.

The Court: Okay. How about . . . as to the punitive, you had [$160,000.00] and [$950,000.00], which adds up . . . to [$1.1 million] [sic]. Is it the same for that also?

Forelady: It's cumulative.

The trial court then asked each side separately if there was "anything else before the jury's dismissed?" Both Larry and Alpine Towers answered that they had nothing further, and the trial court dismissed the jury.[9]

In the context that Larry sought, and could obtain, only one damages award for the same injury, this dialogue adequately demonstrates the jury intended the damage amounts written in the three blanks on the verdict form to be added together for a total award to Larry of $3,400,500.00 actual damages and $1,110,000.00 punitive damages. However, there was more to indicate this was the jury's intention. During deliberations the jury sent a note to the court stating the jurors were

_____

[9] The trial court found, and Alpine Towers argues on appeal, that Larry should have sought further inquiry into the jury's intent and that his failure to do so forecloses his argument that the jury intended the verdicts to be cumulative. We disagree. Larry is the party who initially asked the court to inquire whether the jury intended the verdict to be cumulative. Larry's counsel stated to the court "you can either inquire of the jury here in the courtroom or you can send them out, whatever you're comfortable with." Alpine Towers' counsel stated, "I wouldn't oppose that request." The trial court then made the decision to ask only the forelady. The forelady's answer, "It's cumulative," was the answer Larry was looking for, and therefore Larry had no reason to inquire further on that subject. Alpine Towers, who at that point did have reason to inquire further, said nothing. Therefore, to the extent the lack of further inquiry should be considered, we believe it should be held against Alpine Towers.

deadlocked as to whether to award $4.5 million or $5 million and asking for suggestions. The court responded that it had no suggestions. The total amount of damages awarded, including the amount awarded to Larry's parents, was $4.75 million,[10] which is between the two amounts listed in the note. Further, the court should have considered that it gave the jury no basis on which to find different damage awards on different causes of action. In fact, the only place in the damages instruction where the court differentiated between the causes of action at all was to explain to the jury it may award punitive damages only on the negligence theories of recovery.

This court has stated that "it is the duty of the court to sustain verdicts when a logical reason for reconciling them can be found." *Daves v. Cleary*, 355 S.C. 216, 231, 584 S.E.2d 423, 430 (Ct. App. 2003). In fulfilling this duty, we may not substitute our judgment for that of the jury. *See Lorick*, 153 S.C. at 319, 150 S.E. at 792 (stating the court has a right to give "effect to what the jury unmistakably found" but cannot "invade the province of the jury"). The jury's verdict in this case is readily reconciled as we have explained. We can discern no other way to interpret the verdict consistent with the applicable law and the facts of this case, nor can we find in the record any reason to believe this interpretation does not reflect the intent of the jury. Moreover, during arguments on post-trial motions, counsel for Alpine Towers explained to the trial court what he believed the jury did:

> Let me tell you what I think happened. . . . [When they sent the note asking for suggestions,] they advised that they had arrived at a general block of the amount of the damages that they wanted to give to compensate Mr. Keeter. What they then did because the verdict form is listed in such a way that it says actual damages and punitive damages leaving both blank that they went through and parceled out the total amount of compensatory damages that they wanted to award . . . . And the damages for all three claims are identical . . . , there is no differentiation on the damages . . . . [T]hey

---

[10] At the point of the trial when the jury sent this note, the court had not instructed the jury it must award damages on the strict liability claim or find for the defendant. Thus, the $500.00 damages awarded on that cause of action is not included in this figure.

arrived at a larger figure then they parceled it up to fill in the blanks.[11]

Interpreting the verdict based on "all the matters that occurred in the course of the trial," *Howard*, 144 S.C. at 101, 142 S.E. at 43, we disagree with the trial court and find the jury did not make an "inconsistent damages award." *See* 75B Am. Jur. 2d *Trial* § 1556 (2007) ("In order for a verdict to be deemed inconsistent, there must be inconsistencies within each independent action rather than between verdicts in separate and distinct actions."). Rather, we find that the jury intended the amounts to be added together for a total verdict in Larry's favor of $3,400,500.00 actual damages and $1,110,000.00 punitive damages. Accordingly, we hold the trial court erred in its interpretation of the verdicts and judgment should have been entered in the cumulative amount of actual and punitive damages the jury wrote on the verdict form for each of Larry's causes of action.

### V.      Conclusion

For the reasons explained above, we affirm the trial court's decision to deny Alpine Towers' motions for directed verdict, JNOV, and for a new trial. We reverse the trial court's interpretation of the jury verdict and remand with instructions that judgment be entered against Alpine Towers in favor of Larry Keeter in the amount of $3,400,500.00 actual damages and $1,110,000.00 punitive damages.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**KONDUROS, J., concurs.**

**THOMAS, J., concurring in a separate opinion.**

**THOMAS, J.:** I concur with the majority as to Alpine Towers' appeal. As to Larry's appeal, I concur in result. I agree that this case does not involve the need to elect remedies or an inconsistent verdict. I write separately to clarify that questioning the entire jury and then conforming the jury's verdict to the jury's intent are the best practices for ensuring a valid verdict.

---

[11] In fairness to counsel, the statement was made as part of his argument that the verdicts were inconsistent. However, we believe the statement accurately explains why the jury put different damage amounts in different blanks.

First, when a party raises a question about the jury's intent for the verdict, the best practice is to poll all of the jurors or allow the foreperson to answer the court's questions after consulting with the entire jury. *Lorick & Lowrance, Inc. v. Julius H. Walker Co.*, 153 S.C. 309, 314-15, 150 S.E. 789, 791 (1929). The need to clarify the jury's intent almost invariably arises when the language used on the verdict form is problematic. Without an inquiry of the remaining jurors, questioning only the foreperson unnecessarily risks that the jury's precise intent will remain unknown. This danger is heightened by the likelihood of arguments that the foreperson misunderstood the court's questions or provided a response not reflecting the entire jury's intent.

Second, if the initial inquiry shows the jury's intent differs from what the jury wrote on the verdict form, the best practice is to either send the jury back to conform the verdict to the jury's intent or have the correction made in open court with the jury's consent. *Id.* at 314-15, 150 S.E. at 791. After the jury is discharged, the court may construe the verdict in a manner that diverges from the language used by the jury only when the surrounding circumstances make the jury's intent unmistakable and the court's construction reflects that intent. *Id.* at 319-20, 150 S.E. at 792-93.

I disagree with the majority's statement in footnote 9 that Larry had no reason to seek further inquiry of the jury's intent after the foreperson testified the actual and punitive damages amounts were cumulative. The movant has the most incentive to ask the court to send the jury back to conform the verdict to the jury's intent or have the correction made in open court with the jury's consent. These practices best ensure the verdict reflects the jury's intent, and a verdict rendered in accordance with them is nearly impossible to attack by arguing the jury's intent is unclear. *See Billups v. Leliuga*, 303 S.C. 36, 39, 398 S.E.2d 75, 76 (Ct. App. 1990) (stating "a jury verdict should be upheld when it is possible to do so and carry into effect the jury's clear intention," and holding the jury's intent was clear despite "some confusion in the jury's initial written verdict" because the foreperson testified as to the jury's intent, the clerk published the jury's intent after the foreperson put the intent in writing, and the remaining jurors were polled to ensure their intent complied with the published intent); *cf. Joiner v. Bevier*, 155 S.C. 340, 351, 354-55, 152 S.E. 652, 656-57 (1930) (stating the court has the "duty to enforce a verdict, not to make it" and holding that despite some initial difficulty in getting the jury to render a verdict proper in form, the jury's intent was "entirely clear" when the verdict after a second set of deliberations "corresponded exactly" with the special findings obtained prior to sending the jury back to deliberate). Moreover, if the above practices are not used, the movant risks having to meet its

burden of establishing that the jury's intent is absolutely clear using solely the surrounding circumstances of the case. *Lorick*, 153 S.C. at 319-20, 150 S.E. at 792-93. Here, the jury did not conform the verdict to its intent, nor was the jury polled.[12] Therefore, because the burden to establish the jury's intent remains on Larry as the movant,[13] he must establish the jury's intent was unmistakable based on the surrounding circumstances of the case.

Despite the uphill battle undertaken in this case to establish the jury's intent, I agree to remand for an entry of judgment against Alpine Towers in favor of Larry for $3,400,500.00 actual damages and $1,110,000.00 punitive damages. The surrounding circumstances of this case make the jury's intent unmistakable. Taken together, the forelady's testimony, the jury note, the jury charge, the total damages awarded, and the single injury alleged can lead to only one conclusion: the jury intended to award Larry $3,400,000 in actual damages[14] and $1,110,000 in punitive damages.

---

[12] In fairness to Larry, he asked the trial court to determine whether the verdict in his favor was intended to be cumulative. He suggested to the trial court, "[E]ither inquire of the jury . . . in the courtroom or . . . send them out." The trial court instead only questioned the foreperson in the presence of the other jurors.

[13] In discussing the movant's incentive and burden, I am not referring to our rules of preservation. This issue is preserved because Larry sufficiently raised it to the trial court by seeking to clarify the jury's intent in the above-suggested manner before the jury was discharged and the trial court ruled on his motion.

[14] This amount omits the damages awarded for the strict liability claim because the jury note was sent before the jury re-deliberated the strict liability claim.