10341

CAPITAL CITY GARAGE AND TIRE CO. v. ELECTRIC STOR-
AGE BATTERY COMPANY.

(101 S. E. 838.)

1. PRINCIPAL AND AGENT—EVIDENCE INSUFFICIENT TO SHOW CONTRACT TO RENEW AGENCY AGREEMENT OR GIVE EXCLUSIVE AGENCY.—Evidence of oral conversation and letters *held* insufficient to establish a contract to continue plaintiff's agency for the sale of defendant's batteries, or to give it an exclusive agency.

2. PRINCIPAL AND AGENT—AGREEMENT TO MAKE AGENCY CONTRACT IS NOT BINDING WHERE TERMS WERE NOT AGREED UPON.—An agreement to make a contract, giving plaintiff an exclusive agency for defendant's batteries, was not binding, where the terms of the contract were not agreed upon, other than that it should contain an exclusive provision.

3. APPEAL AND ERROR—SUBMISSION OF QUESTION OF CONTRACT WAS ERROR
FAVORABLE TO PLAINTIFF, WHERE EVIDENCE DID NOT SHOW CONTRACT.
—Where the evidence was insufficient to establish the contract sued
on, it was error to submit to the jury the question of whether there
was a contract, but it was an error favorable to plaintiff, of which
he could not complain.

4. CONTRACTS—WHEN QUESTION OF CONTRACTS IS ONE OF FACT AND
WHEN ONE OF LAW.—Whether or not there is a contract is ordinarily
a question of fact for the jury, but, when the undisputed facts do
not make a contract, it becomes a question of law and not of fact.

Before SEASE, J., Richland, Spring term, 1919.  Affirmed.

Action by the Capital City Garage and Tire Company against the Electric Storage Battery Company.  Judgment for defendant, and plaintiff appeals.

*Messrs. Tompkins, Barnett & McDonald,* for appellant, submit: *The trial Judge was in error in submitting question of contract or no contract to the jury:* 105 S. C. 478; 92 S. C. 95.  *The Circuit Judge was in error in charging the jury that plaintiff could not recover unless actual damages were shown:* 140 N. C. 140; 3 L. R. C. (N. S.) 225; 17 Corpus Juris 718; 13 Cyc. 17; 1 Nott & McC. 343 (10 S. C. L.); 3 Hill 279; 2 Hill 470; 108 S. C. 220.  *Is such error reversible?* Code of Civil Procedure, sec. 361; 13 Cyc. 21; 116 Ga. 784; 43 S. E. 54; (Ala.) 57 So. 78; (Mo.) 142 S. W. 1107; 141 S. C. 1048; (Mo.) 124 S. W. 29; 17 Corpus Juris 1069; 158 Ind. App. 134; 133 N. Y. S. 815; 149 App. Div. 220; 47 Mont. 437; 163 Ill. App. 516.  *The Circuit Judge was in error in charging that it makes no difference how much fraud there may be connected with the breach of a contract, if there is no damage there can be no recovery:* 101 S. C. 20; 97 S. C. 385; 105 S. C. 147; 108 S. C. 220; 13 Cyc. 13; 77 S. C. 546; 85 S. C. 295; 110 S. C. 233 (96 S. E. 295).  *Was there evidence of fraud?* 92 S. C. 393.

*Messrs. Nelson & Gettys,* for respondent, submit: *That if a Judge submits to the jury a question that he himself should decide, his attention should be called to his error:*

14 S. C. 177.  *Also, if he mistakes the issues:* 97 S. C. 116. *Where one party claims that the contract is in writing and the other that it is oral, the question should be submitted to the jury:* 19 S. C. 353.  *If plaintiff wished a more detailed charge upon the question of nominal damages, he should have presented a request to this effect:* 15 S. C. 122; 68 S. C. 424.  *As to Judge's charge that there can be no recovery of punitive damages for a fraudulent breach of contract unless some actual damage is suffered:* 60 S. C. 67; 65 S. C. 1; 70 S. C. 418; 77 S. C. 56; 77 S. C. 546; 97 S. C. 388; 101 S. C. 20; 108 S. C. 217.  *Punitive damages will not be allowed in an action for a breach of contract except where the breach is fraudulent or is accompanied by fraudulent act:* 70 S. C. 108.  *Fraud must be pleaded and well pleaded in order to avail:* 65 S. C. 184; 95 S. C. 240.  *Mere proof that the contract was breached, even with knowledge that damage would result to the plaintiff, does not warrant punitive damages:* 87 S. C. 239.  *The jury found no actual damages, and conceding that proof of violation of a contract will of itself entitle the plaintiff to nominal damages without further proof, this Court will not reverse the case merely for the purpose of allowing plaintiff to recover nominal damages:* 6 Rich. L., p. 82 (40 S. C. L.) ; 2 Spears 168; 1 Bailey 98; 2 Nott & McCord 85 (11 S. C. L.).

January 26, 1920.

The opinion of the Court was delivered by MR. JUSTICE FRASER.

This is an action for actual and punitive damages, for a fraudulent breach of contract to grant an exclusive agency for the sale of Exide batteries in the city of Columbia. The complaint alleges a fraudulent conspiracy between the respondent and two others, to wit, the Consolidated Auto Company and the Columbia Ignition Specialty Company. The plaintiff offered to discontinue against the two latter defendants, but when a motion was made to transfer the

case to the Federal Court, as the respondent was a foreign corporation, the appellant withdrew its offer. The case was later dismissed as to the two defendants, and the case proceeded against the respondent.

The appellant bases its claim upon two letters, one dated June 8, 1916, and one dated June 13, 1916, set out in the record, and conversations between the authorized agents of the plaintiff and the defendant. There were several letters that passed between the parties, and in order to construe them it will be necessary to consider some of the others also:

"September 28, 1915. Capital City Garage, 1218 Lady Street, Columbia, S. C.—Gentlemen: I have your favor of the 22d instant and herewith return your copy of the contract.

"We keep a complete record of business received from our various customers, whether this business is handled on a C. O. D. or open account basis. The reasons you give to support your contention that we should place our service station contract with you are certainly good ones, but it is not entirely a question of dollars and cents with us. Of course, we make more profit on an order for a new battery to replace some other make of battery than we do on one covering repairs to one of our own batteries, but we are really more anxious to give the users of Exide batteries good service than we are to get business away from our competitors. We want to do both, which is what makes it so hard to decide between yourselves and the Consolidated Auto Company.

"Another factor which enters into the matter is that we have an agreement with the Buick Motor Company to the effect that we will give Buick agents the same discount which we give to our service station, provided such Buick agents sign a contract, live up to its terms and maintain charging and repair facilities equal to those maintained by our regularly appointed service stations.

"There is nothing in our contract which would prevent us from having two service stations in Columbia. We don't want two stations there, but, on account of our agreement with the Buick Motor Company, it is very likely that we will be obliged to do so, at least for the present. Yours very truly, A N. Bentley, Manager Atlanta Office."

Exhibit D. "May 5, 1916. Electric Storage Battery Company, Atlanta, Ga.—Gentlemen: Attention Mr. Bentley. We are forwarding you under separate cover the latest issue of the Record.

"You will note that we are giving the Exide great prominence in our spaces that we have contracted for.

"We are just about to install one of the most modern charging outfits and expect to get after this business in the future.

"We would like to have an expression of what you think of the way we are handling your line in this city.

"Thanking you for your attention, we are, Yours very truly, Capital City Garage, by G. R. McNeill."

Exhibit F. "May 10, 1916. Capital City Garage, 1218 Lady Street, Columbia, S. C.—Gentlemen: We have your favor of May 5th and have also received the copy of the Record. We are very glad to note the prominence which you are giving the Exide batteries in your advertising space.

"As the writer advised you when you were in Atlanta some time ago, we much prefer to market our starting and lighting batteries through a company which does not represent any gasoline automobile manufacturer, but at the same time our relations with the Consolidated Auto Company have always been most pleasant and of considerably longer standing than our relations with you, for which reason I have not been willing to cancel our contract with the Consolidated Auto Company without some good and reasonable ground for such cancellation. I have been hoping that you would succeed in securing the bulk of the battery business in and around Columbia, but regret to advise that you have not done so to date.

"I am very glad to note that you are about to install a modern charging outfit and that you expect to make greater efforts to get this class of business in the future. For the first four months of this year the Consolidated Auto Company has purchased approximately 65 per cent. more material from us than you have. Yours very truly, A. N. Bentley, Manager Atlanta Office."

Exhibit G. "June 8, 1916. Capital City Garage, Columbia, S. C.—Dear Sir: Attention Mr. McNeill. Mr. Hill has returned from Atlanta and has reported to me regarding his conversation with you relative to making you our official service station in Columbia. I do not like the idea of having two official service stations in a city of the size of Columbia, but it seems to be the only solution of the problem at the present writing. Our contract with the other people will not expire until September 16th of this year, and as that contract was entered into in good faith by both parties, I do not feel that I would be justified in canceling it before it expires.

"The main difference between yourselves and the other people up to date has been that they are supplied without standard metal service station signs and you were not, but Mr. Hill reports that they never put the signs up and do not know what has become of them. I think, therefore, that the thing for us to do is to furnish you with these signs, one of which goes outside of your door and the other inside. These signs will make you our approved and official service station, and we will trust to luck that the other people will not be able to find the signs which we sent them. If they do and put them up, we will have two official service stations until their contract expires.

"I propose, prior to the expiration of their contract, to notify them that we will not renew it, but, if they insist, we will continue to sell them batteries for Buick and Cadillac cars only, at the distributor's price. We will be obliged to do this on account of our relations with the Buick Cadillac Companies.

"Please let me know if you find this arrangement to be satisfactory. Yours very truly, A. N. Bentley, Manager Atlanta Office."

Exhibit H. "June 13, 1916. Electric Storage Battery Company, Atlanta, Ga.—Gentlemen: Attention Mr. Bentley. Replying to your letter of the 8th, we beg to state that we have noted contents very carefully, and the proposition that your Mr. Hill talked over with us, and confirmation of same in your letter meets with our approval, with the exception of one thing, that is, you made a little difference in the discount quoted us of 2½ per cent., which we trust will be ·orrected and we be given the proper discount that is due ·ervice stations.

"We presume that Mr. Hill told you what our plans are. The wrinter himself expects to be over in Atlanta next month some time, when we will go into this matter thoroughly and know exactly the proper manner in which we should handle this service station proposition, also give you an order for the necessary equipment that we should have. When we do get equipped up, we do not think that you will ever regret, or find it a bad business move in connecting up with us as our official service station.

"Thanking you for considerations extended us, we beg to remain, Capital City Garage, G. R. McNeill."

Exhibit I. "June 15, 1916. Capital City Garage, 1218 Lady Street, Columbia, S. C.—Gentlemen: Replying to your favor of June 13th, our action in appointing you as our official service station in Columbia automatically carries with it a change in the discount which we have been making you from 50 per cent. to 52½ per cent.

"I note that you expect to come to Atlanta next month to go into this matter with us, and would advise that the writer will leave Atlanta on July 10th for his vacation. I trust that you can arrange to come before that date. Yours very truly, A. N. Bentley, Manager Atlanta Office."

Exhibit J. "September 8, 1916.   Electric Storage Battery Company, Atlanta, Ga.—Gentlemen: Attention Mr. Bentley. As the time is drawing near to close the contract for your official service station in Columbia, S. C., we thought we would write you and let you know the true conditions in the city.

"In your letter of June 8th you stated that we would get the official station of all cars except the Buick and Cadillac. Since you wrote this letter we presume that you are aware that the Consolidated Auto Company does not handle the Cadillac any more, and at the present time the headquarters of this car is at our garage, which we presume that you are aware of by the letter that you received from the Only Garage, of Charleston, S. C., of which we have a duplicate, notifying you that they were putting up with us, which goes again to convince you that we are the logical place for the service station, as we are friendly with all of the automobile dealers in Columbia.

"For your information, we presume that you would like to know what preparations we have made to take care of this work, as we have been very quiet lately in regard to this matter for the reason that the Perry-Mann Electric Company has failed to come up to their contract in delivering us the equipment that we have ordered.

"We have recently built a separate building to take care of this work, and as soon as we know definitely when we will receive this equipment we will then send a man over to Atlanta to stay and receive the necessary instructions to enable us to give the proper service to car owners.   This man is one of our best electrical men, and we think that he would be the best man suited to take this course in storage battery work.   He will also have the authority to order the necessary stock and equipment from you that is needed.

"We trust that the above information will be satisfactory to you, and we assure you that just as soon as we get our equipment in, Exide batteries in this city will take a decided

boom that it has never had before, as we have several plans that we are going to work out. That is going to be to the advantage of the ones that are using Exide equipment and we know that when we let them know the service that we intend, that you will heartily approve of it.

"Trusting to hear from you by return mail in regard to this matter, we are, Yours very truly, Capital City Garage, by G. R. McNeill."

Exhibit K. "September 19, 1916. Capital City Garage, Columbia, S. C.—Gentlemen: Replying to your letter of September 8th, we have definitely decided to place our contract for the coming year with the Columbia Ignition Specialty Company, and regret to advise that we cannot renew our contract with you.

"Although you have given us your promise of your intention to go after the battery business in the manner contemplated when we first placed our contract with you, you have not fulfilled your promise, and the amount of business which you have done with us during the past year does not justify us in renewing the contract. Yours very truly, A. N. Bentley, Manager Atlanta Office."

The plaintiff had a contract with the defendant for the sale of Exide batteries, made in September, 1915, that expired in September, 1916. That contract provided:

"4. It is further agreed that if the terms and conditions of the contract were not faithfully carried out by the purchaser (the plaintiff), the Battery Company (the defendant) might cancel the contract at its option by mailing notice to the purchaser."

It will be observed that the point in the plaintiff's mind in its conferences and letters was the elimination of its competitor, and not the renewal of its own contract.

In speaking of the conversations, Mr. McNeill said:

"We wanted to sell Exide batteries in Columbia and wanted the exclusive agency for it. In the fall of 1915 the Exide battery people entered into a contract with us and

with the Consolidated Auto Company, giving us both the same rights, except Consolidated Auto Company was given 52½ per cent. discount, as against our 50 per cent. We continued to sell batteries, when, in December, 1915, Mr. Mitchell and I went to Atlanta to see if we could get this agency exclusively, and we saw Mr. Bentley, the manager, and he told us from the records the Consolidated Auto Company was doing more business than we were doing, and he didn't see where he could make a change; that there was one thing in our favor, that we were not handling any make of cars, and anybody with an Exide battery on their car would rather go to us in place of going to Consolidated Auto Company, for the reason that they were handling makes of cars and there may be more partiality shown, so we came back and started to push the Exide and to advertise them and tried to get ahead of the Consolidated Auto Company in business. We went on a competition basis with the Consolidated Auto Company, but found we were handicapped and people would come around and say well, they could go around to the Consolidated, that they had a Buick, and stuff like that, and we saw it would not pay us to push that battery unless we could get the exclusive agency. I wrote Mr. Bentley in April. In answer to this letter Mr. Bentley stated that he was going to send somebody over here. Mr. Hill was the representative that the Exide battery people sent over here to investigate conditions to see who would be the logical place for its battery proposition for the following year. We ran a general garage business. We did not handle any cars and we catered to the repair of cars and storage and accessories and vulcanizing. Mr. Hill said that was one thing in our favor, and I told Mr. Hill: "The point has come where we have got to decide what to do. If we can get this agency for the next year exclusively we will go to work and make an addition to our place to take care of them and install electrical machinery to take care of that and send a man over to Atlanta to be coached up—that is, to get

instructions in charging batteries and repairing them,' etc. Mr. Hill told me he could not give me a decisive answer, but he would go to Atlanta and take it up with Mr. Bentley, who was manager of the Exide place in Atlanta, and write me what I could expect."

Neither in the letters nor in the conversation on the subject is there an agreement to renew the 1915-1916 contract. The defendant could not make an exclusive contract, and the plaintiff knew that an exclusive contract was impossible, because of a previous contract with the Buick and the Cadillac Companies. We see nothing in the verbal or written statements of the parties to form the basis of a contract to continue the agency of the plaintiff, much less to form the basis for a contract to make an exclusive contract. Even if there appeared a contract to make a contract, the terms of the contract to be made must be agreed upon, and there was no allegation or proof of the terms of the contract to be made, except that it was to contain an exclusive provision, *i. e.*, no contract at all.

Even if we can assume that the contract to be made was to be a renewal of the 1915-1916 contract, with a provision for exclusive agency, that contract gave the right to the defendant to terminate it at any time if plaintiff did not carry out the conditions. There was no testimony to show that the plaintiff had carried out that contract.

The first exception complains of error on the part of the presiding Judge in leaving it to the jury to say whether there was or was not a contract between the parties. His Honor was in error, but of this error the appellant cannot complain, because it was more favorable to it than the proof warranted. Whether there is or is not a contract is ordinarily a question of fact for the jury. Where, however, the undisputed facts do not make a contract, then it becomes a question of law, and not a fact.

It is not improper to say that such an error as this is unavoidable. In the necessary rush and hurry of a trial,

the presiding Judge has neither the time nor the opportunity to carefully compare several writings supplemented by verbal statements.

Having determined as a matter of law that there was no contract between the parties, the other questions become academic, and need not be considered.

The judgment is affirmed.