762 S.E.2d 54

**ALLEGRO, INC., Respondent,**

v.

**Emmett J. SCULLY, Synergetic, Inc., George C. Corbin and Yvonne Yarborough, Appellants.**

Appellate Case No. 2008–099926.

No. 5245.

Court of Appeals of South Carolina.

Submitted May 28, 2014.

Decided June 30, 2014.

Rehearing Denied Aug. 26, 2014.

394

396

398

Amy Lohr Gaffney, of Gaffney Lewis & Edwards, LLC, and Charles Mitchell Brown, William C. Wood, Jr., Brian Patrick Crotty, and Allen Mattison Bogan, all of Nelson Mullins Riley & Scarborough, of Columbia, for Appellants.

Robert L. Widener and Richard J. Morgan, both of McNair Law Firm, PA, of Columbia, for Respondent.

LOCKEMY, J.

In this civil action, Emmett Scully, Synergetic, Inc. (Synergetic), George Corbin, and Yvonne Yarborough (collectively, Appellants) contend the trial court erred in (1) admitting into evidence the order granting a temporary injunction; (2) admitting into evidence Allegro, Inc.'s (Allegro) expert report; (3) certifying Daniel McHenry as an expert; (4) excluding evidence relating to the issue of Allegro's damages; (5) failing to grant motions for directed verdict and judgment notwithstanding the verdict (JNOV) as to the claims for civil conspiracy, breach of contract, breach of contract accompanied by a fraudulent act, fraud, and negligent misrepresentation; (6) reforming the jury's damages verdicts without providing the option of a new trial; and (7) failing to require an election of remedies. We reverse and remand.[1]

---

1. This case was previously decided by this court; our supreme court remanded it for a decision on the issues involving the directed verdict

## FACTS

Allegro is a professional employer organization (PEO) that was formed in the late 1990s by its initial owner, Mary Etta McCarthy. A PEO provides human resource services for companies wanting to outsource that function. Scully joined Allegro in August of 1998 as president and a member of its board of directors. He was also given thirty percent of Allegro's stock. The remaining directors consisted of McCarthy, who was the majority owner, and one of Allegro's clients, Frank Brown. Between 1998 and 2001, Scully's ownership interest in Allegro increased to forty-nine percent and McCarthy held the remaining fifty-one percent interest.

Allegro and Scully never executed an employment contract or non-compete agreement. Furthermore, Allegro did not have an employee handbook that was issued to or utilized by its employees. However, when Scully joined Allegro, Scully and McCarthy negotiated a Partnership/Buy–Sell Agreement that governed the percentage and change in ownership of Allegro.[2]

McCarthy was actively involved in Allegro's management until Scully joined and took over the day-to-day operations. Scully testified that as president, he was entrusted with managing the operations in the best interest of Allegro along with financial oversight of the company. Beginning in late 2002 or early 2003, Scully expressed frustrations about the business to his friend, Corbin, who was also a certified public accountant (CPA). Additionally, Corbin's company, Merritt, was a client of Allegro. Corbin advised Scully regarding three possible options: (1) Scully could buy out McCarthy; (2) McCarthy could buy out Scully; or (3) Scully could start his own business. Scully then consulted with Corbin about how to make an offer to purchase McCarthy's interest in Allegro. In March of 2003, Corbin issued a letter to Scully outlining three approaches for determining a fair purchase price for McCarthy's shares in Allegro. In concluding the letter, Corbin stated:

---

and JNOV motions. *Allegro, Inc. v. Scully,* 400 S.C. 33, 733 S.E.2d 114 (2012) *remanded by* 408 S.C. 200, 758 S.E.2d 716 (2014).

**2.** Brown was not a party to this agreement.

The overall issue here is that something needs to happen. The ongoing tension between you and Mary Etta is obvious. That has to be tiring for both of you. It is also probably obvious to employees. Either way, it is not healthy for the business. The business has a better chance of success without that tension. If one of you has to sell out to relieve it, then that is what needs to happen.

In the spring of 2003, Scully informed McCarthy that he wanted to purchase her ownership interest in Allegro. Scully also discussed his proposal with Allegro's third director, Brown. During his conversation with Brown, Scully stated that if he could not purchase McCarthy's shares, he would set up his own PEO business. Over the course of a series of discussions with McCarthy in 2003, Scully told her that if they could not agree upon a price at which she would sell her ownership interest in Allegro, he would leave the company and form a competing company, taking employees and clients with him. In response to these conversations, McCarthy suggested having Allegro valued to determine the price of her interest. After McCarthy hired the Geneva Corporation (Geneva) to conduct a valuation study, Corbin reviewed the study and provided feedback to Scully at Scully's request.

On December 24, 2003, McCarthy received a letter from Scully offering to purchase her shares, setting forth two options as to the purchase price, and asking for her response by January 23, 2004. Prior to sending McCarthy the offer, Scully had asked Corbin to review it and Corbin advised that it was a fair offer. McCarthy received a subsequent letter from Scully on January 23, 2004, restating his offer. On January 29, 2004, McCarthy responded with a written counter-offer. Scully replied in a February 2, 2004 letter, stating, "if we are unable to come to terms the result is a lose, lose, lose for everyone involved. If I leave Allegro and start a new PEO we will be in competition for the same customers and employees."

Having failed to reach an agreement regarding the purchase of Allegro, Scully gave his letter of resignation to McCarthy on February 16, 2004. McCarthy then told Scully she would accept his last offer to purchase her ownership interest in Allegro. They agreed her lawyers would draw up the neces-

sary paperwork by the end of that week. After that conversation, Scully left town on a business trip for Allegro. While Scully was out of town, McCarthy decided she did not want to sell her ownership interest after all and focused her efforts on retaining Allegro. During Scully's absence, McCarthy met with Jim Everly, whom she hired to replace Scully as Allegro's president. McCarthy met with Scully on February 23, 2004, and presented Scully with a letter accepting his resignation. Immediately following Scully's departure from the company, McCarthy and Everly held a meeting with all Allegro employees and informed the employees that they must sign non-compete contracts. Yarborough was an employee of Allegro from 2000 until 2004. At the meeting with McCarthy and Everly, Yarborough and another employee, Lisa Milliken, refused to sign the non-compete contracts.

McCarthy and Everly contacted all of Allegro's clients to inform them Scully was no longer employed by Allegro and made arrangements to meet with each client. They first met with Corbin of Merritt, who told them that due to his personal friendship with Scully, Merritt's business would likely move to Scully's new company, Synergetic. Pursuant to Merritt's contract with Allegro, Corbin sent a thirty day notice in the form of a letter on February 27, 2004, announcing its termination of their contract as of March 31, 2004. Letters from other clients terminating their contracts with Allegro shortly followed.

After his departure from Allegro, Scully formed his new company, Synergetic. On March 1, 2004, Yarborough resigned as an employee of Allegro and began working for Synergetic on March 2, 2004. Millikin also resigned from her position with Allegro on March 1, 2004, and subsequently became an employee of Synergetic.

On April 15, 2004, Allegro initiated this action by filing a complaint against Scully, Yarborough, Corbin, and Synergetic. On that same date, Allegro filed a motion for a temporary injunction, seeking to enjoin Scully, Yarborough, and Synergetic from soliciting business from Allegro's clients. That motion was granted in an eleven page order after a hearing on October 14, 2004.

At the close of Allegro's case, as well as at the close of all evidence, both sides moved for directed verdicts. These motions were denied. The trial court then submitted to the jury eleven of the claims asserted by Allegro.[3] Nine of the claims applied to Scully alone,[4] one claim applied to Yarborough alone,[5] and one claim applied jointly to Scully, Yarborough, and Corbin.[6] The jury's special verdict form listed each of the eleven causes of action and asked two questions for each charge: (1) whether the plaintiff had proven that claim; and (2) if the claim had been proven, the amount of actual damages and punitive damages (where appropriate) the jury awarded as to each claim.

During deliberations, the jury sent a question to the trial court asking whether they should list the damages specific to each cause of action individually, or place the overall total amount the jury decided to award. In discussing the verdict with the foreperson, using apples as the hypothetical award, the trial court stated, "You give a certain number of apples for each cause of action. And that's all you are worried about. And there are some law related matters that I will take care of as a Judge . . . ." The foreperson stated she understood the concept, and the trial court continued:

So, for each cause of action depends on the breach of duty or [contract or] whatever you may find give a number, assign a value that you have been—if the [p]laintiff's have [proven] to you by the greater weight of preponderance of evidence they are entitled to two apples on this one or three

---

**3.** Allegro acknowledges no claims against Synergetic were submitted to the jury; Synergetic joins this appeal because the issue was not addressed in the trial court's orders denying the Appellants' post-trial motions.

**4.** Scully was the sole defendant on charges of breach of contract, breach of contract with fraudulent intent, fraud, negligent misrepresentation, breach of fiduciary duty, breach of duty of loyalty, gross negligence, violation of section 33–8–310 of the South Carolina Code, and violation of section 33–8–420(a) of the South Carolina Code.

**5.** Yarborough was the sole defendant on one breach of loyalty charge.

**6.** Scully, Yarborough, and Corbin were jointly charged with civil conspiracy.

on that one or four on that one, that's the way you do it and don't worry about the total.[7]

The jury returned a verdict for Allegro on all eleven causes of action. The jury awarded actual damages in the amount of $160,000 for each of the causes of action. Furthermore, the jury awarded $75,000 in punitive damages on the breach of loyalty claim against Yarborough, and $175,000 in punitive damages on the civil conspiracy claim against Scully, Yarborough, and Corbin jointly. The jury's verdict form shows that an award of $1,760,000 had initially been entered in the designated space for actual damages for the first cause of action, but it was struck through and replaced with $160,000.

Once the jury verdict was announced, the foreperson was questioned as to the total number of "apples" they intended to award Allegro, and their response was $1,760,000. The court then asked "What about punitive damages in terms of the total number of apples you wanted to give to [Allegro]?" The foreperson said the jury wanted to give $250,000 total to Allegro. The court finally stated, "We can add it up but your mathematician says it was the intent of this jury to award [Allegro] $2,010,000," to which the foreperson agreed. As a final review, the trial court said, "Actual damage 1.7 million and the remainder of that sum is punitive damages totaling in the amount of $2,010,000." Subsequently, no change was made to the verdict form by either the jury or the judge and no change was requested by Allegro.

The trial court completed a Form 4 order, which stated the total amount of actual and punitive damages and their grand total of $2,010,000. The Form 4 order did not state that these amounts applied to all, or any, of the individual Appellants, but the special verdict form was attached showing the specific damages awards. Further, the Form 4 order gave no indication that the jury's verdict, as stated on the special verdict form, had been changed, altered, or modified in any way.

In their post-trial motions, Appellants moved for an election of remedies and asserted grounds for JNOV and a new trial.

---

7. It is unclear whether the trial court addressed the issue of the jury's verdict solely with the foreperson, or in the presence of the entire jury. This court strongly warns the trial bench of the danger of interacting with only the foreperson on substantive matters.

On July 14, 2008, the trial court denied all of Appellants' post-trial motions.[8] In denying the motion for an election of remedies, the trial court stated:

> Based upon the verdict form and the conversations with the jury before and after its verdict, I am convinced the jury intended to award $1.76 Million Dollars in actual damages for each cause of action, and that it intended to award $250,000 in punitive damages on the two causes of action. I am further convinced that the jury's apportionment of the verdict amongst the various causes of action does not reflect a finding that the Plaintiff suffered only $160,000.00 in actual damages. Thus, entering judgment for the Plaintiff in the total amount of $1.76 Million Dollars in actual damages and $250,000.00 in punitive damages does not give rise to a double recovery.

On July 23, 2008, Appellants filed a motion to amend and/or set aside the July 14, 2008 order. This motion was also denied in an order by the trial court on April 5, 2010.[9] The trial court stated that in its May 5, 2006 Form 4 order, it reformed the jury's verdict, changing it from eleven separate actual damages awards of $160,000 and two punitive damages awards of $75,000 and $175,000, which resulted in different totals against different defendants, to one total verdict of $2,010,000 against all the defendants. The trial court further stated any issue regarding this "reformation" of the jury's verdict not being coupled with the option of a new trial was waived because the issue "was not raised in Defendants' post-trial motions." This appeal followed.

## ISSUES ON APPEAL

1. Did the trial court err in admitting the order granting a preliminary injunction to Allegro into evidence?

2. Did the trial court err in admitting McHenry's report into evidence?

3. Did the trial court err in qualifying McHenry as an expert in the field of "damages"?

---

8. Prior to this order, Appellants submitted their objections to the proposed order.

9. The Appellants objected to the 2010 order prior to its entry as well.

4. Did the trial court err in excluding evidence that Appellants maintain was relevant to the issue of Allegro's damages as well as Allegro's failure to mitigate those damages?

5. Did the trial court err in denying Appellants' directed verdict and JNOV motions in regards to civil conspiracy?

6. Did the trial court err in denying Appellants' directed verdict and JNOV motions in regards to the contract claims?

7. Did the trial court err in denying Appellants' directed verdict and JNOV motions in regards to the fraud and negligent misrepresentation claims?

8. Did the trial court err in reforming the jury verdict?

9. Did the trial court err in not requiring an election of remedies?

## LAW/ANALYSIS

### I. Evidentiary Errors

" 'The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion.' " *State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 57–58 (2011) (quoting *State v. Williams*, 386 S.C. 503, 509, 690 S.E.2d 62, 65 (2010)). " 'An abuse of discretion occurs when the trial court's ruling is based on an error of law.' " *Id.* at 444, 710 S.E.2d at 58 (quoting *State v. McDonald*, 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000)). A finding of abuse of discretion does not end the analysis, however, "because to warrant reversal based on the admission or exclusion of evidence, the appealing party must show both the error of the ruling and prejudice." *Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 557, 658 S.E.2d 80, 86 (2008). "Prejudice is a reasonable probability that the jury's verdict was influenced by the challenged evidence or the lack thereof." *Id.*

### 1. Preliminary Injunction Order

Appellants argue the trial court erred in admitting the temporary injunction order into evidence. We agree.

■ First, we will address the threshold issue of preservation. For an objection to be preserved for appellate review, the objection must be made at the time the evidence is presented. *State v. Johnson*, 363 S.C. 53, 58, 609 S.E.2d 520, 523 (2005). Further, it must be made with sufficient specificity "to inform the trial court of the point being urged by the objector." *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998). However, when the evidence is inherently prejudicial, the grounds for the objection are patent, and the issue will be found preserved. *Dunn v. Charleston Coca–Cola Bottling Co.*, 311 S.C. 43, 43–47, 426 S.E.2d 756, 757–58 (1993) (holding a request that a voir dire question regarding insurance coverage "not be charged" was sufficient to preserve the issue, because even though specific grounds were not stated, the grounds were patent because the voir dire question was so inherently prejudicial).

■ We will examine whether the introduction of a preliminary injunction order into evidence is inherently prejudicial, thus making the grounds of the objection to its admittance patent. An applicant for a preliminary injunction must allege sufficient facts to state a cause of action for injunction and demonstrate that this relief is reasonably necessary to preserve the rights of the parties during the litigation. *Cnty. of Richland v. Simpkins*, 348 S.C. 664, 669, 560 S.E.2d 902, 904 (Ct.App.2002). One of the elements the applicant must establish is that he has a likelihood of success on the merits. *Scratch Golf Co. v. Dunes W. Residential Golf Props., Inc.*, 361 S.C. 117, 121, 603 S.E.2d 905, 908 (2004); *see Transcontinental Gas Pipe Line Corp. v. Porter*, 252 S.C. 478, 481, 167 S.E.2d 313, 315 (1969) ("It is well settled that, in determining whether a temporary injunction should issue, the merits of the case are not to be considered, except in so far as they may enable the court to determine whether a prima facie showing has been made. When a prima facie showing has been made entitling plaintiff to injunctive relief, a temporary injunction will be granted without regard to the ultimate termination of the case on the merits."). A temporary injunction is granted without prejudice to the rights of either party pending a hearing on the merits, and "when other issues are brought to trial, they are determined without reference to the temporary injunction." *Helsel v. City of N. Myrtle Beach*, 307 S.C. 29,

32, 413 S.E.2d 824, 826 (1992) (citing *Alston v. Limehouse,* 60 S.C. 559, 569, 39 S.E. 188, 191 (1901) (stating "no fact decided upon such motion [for a temporary injunction] is concluded thereby, and when the other issues are brought to trial they are to be determined without reference to said orders")). The purpose of a temporary injunction is to preserve the status quo and prevent irreparable harm to the party requesting it. *Powell v. Immanuel Baptist Church,* 261 S.C. 219, 221, 199 S.E.2d 60, 61 (1973).

In the case at bar, the order included approximately four and a half pages of "Findings of Fact" by the trial court, as well as this statement by the trial court:

> The Court carefully considered the pleadings, documents, and argument of counsel at a hearing ... and finds that despite Defendants' denials of wrongdoing, there is sufficient evidence to indicate that the Defendants were engaged in the activities alleged by the Plaintiff.

After Appellants' objection to the admission of the preliminary injunction order, the trial court stated, "I think subject to your earlier objection, is that fair enough, that I've already ruled upon?" The Appellants concurred with the trial court, and the trial court continued, stating, "Very well. We might go into a little more detail later but it is over your objection."

It is hard for this court to determine an instance where admission of a preliminary injunction order into the trial record would not be highly prejudicial. While Appellants did not state specific grounds for their objection, we find the introduction of the order for temporary injunction into evidence was inherently prejudicial, and thus, the grounds for the objection were patent. *See Dunn,* 311 S.C. at 43–47, 426 S.E.2d at 757–58. We believe admitting this order had a high possibility of influencing the jury due to its numerous findings of fact and statements concluding defendants' liability for the alleged charges. The trial court abused its discretion in admitting the order into evidence. Thus, we reverse and remand in accordance with this decision.

## 2. McHenry's Expert Report

■ Appellants argue McHenry's written report and its attachments were cumulative of his subsequent testimony and

contained impermissible and highly prejudicial hearsay, making its admission into evidence reversible error. We agree to the extent that the written report included the preliminary injunction order, but find the remainder of the testimony did not prejudice Appellants.

"Rule 703, SCRE, allows an expert giving an opinion to rely on facts or data that are not admitted in evidence or even admissible into evidence." *Wright v. Hiester Constr. Co.*, 389 S.C. 504, 523, 698 S.E.2d 822, 832 (Ct.App.2010) (citing *Jones v. Doe*, 372 S.C. 53, 62, 640 S.E.2d 514, 519 (Ct.App.2006)). However, Rule 703 does not allow the admission of hearsay evidence simply because an expert used it in forming his opinion; the rule only provides the expert can give an opinion based on facts or data that were not admitted into evidence. *Jones*, 372 S.C. at 62–63, 640 S.E.2d at 519.

As stated previously, for an objection to be preserved for appellate review, the objection must be made at the time the evidence is presented. *State v. Simpson*, 325 S.C. 37, 42, 479 S.E.2d 57, 60 (1996). Further, it must be made with sufficient specificity "to inform the trial court of the point being urged by the objector." *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998).

At trial, Appellants objected to McHenry's report after Allegro moved to put it into evidence. The Appellants stated, "Same objection," purportedly in reference to a previous objection on the record that was based on matters discussed in camera. While the in camera discussion was either not placed on the record or not given to us in the record on appeal, the trial court's 2008 order states,

I overruled this general objection which was insufficient as a matter of law to present any objection, upon the ground that experts are permitted to base their opinion on hearsay if it is the type generally relied upon by experts. The Defendants never objected that the hearsay, to the extent there was any, was not this permissible type of hearsay.

In light of the trial court's 2008 order, it is apparent the objection was a general hearsay objection. In their 2006 post-trial motion, the Appellants objected again to the admission of McHenry's report "because this report was cumulative of his testimony, contained impermissible hearsay, and contained

matters that were irrelevant and which served only to unfairly prejudice Defendants, confuse the issues, and mislead the jury." They further stated the report contained a document that gave "a purported timeline replete with multiple layers of impermissible hearsay, self-serving statements, conclusions of fact and law, Plaintiff's own opinions, and references to impermissible damages such as Plaintiff's litigation costs and attorneys' fees in this action."

■ We believe the specific issue of impermissible hearsay in the expert's report is preserved for appellate review, as the issue was raised with sufficient specificity, and ruled upon by the trial court. *See S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 301–02, 641 S.E.2d 903, 907 (2007) (holding that to be preserved for appellate review, an issue must have been (1) raised to and ruled upon by the trial court, (2) raised by the appellant, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity). There is nothing in the record on appeal that indicates the trial objection included arguments that the report was cumulative and contained matters that were irrelevant; thus, we find those issues are not preserved for our review. *See McCall v. IKON*, 380 S.C. 649, 663, 670 S.E.2d 695, 703 (Ct.App.2008) (holding that the appellant has the burden of providing a record sufficient for appellate review).

■ Here, McHenry was allowed to rely on hearsay in his report when giving his expert opinion. However, the admission of the report itself simply because McHenry used it in forming his expert opinion was in error. The report contained many instances of hearsay, including numerous statements by Scully. However, "the admission in evidence of inadmissible hearsay affords no basis for reversal where the out-of-court declarant later testifies at trial and is available for cross-examination." *Clark v. Ross*, 284 S.C. 543, 551, 328 S.E.2d 91, 97 (Ct.App.1985), *abrogated by Sherer v. James*, 290 S.C. 404, 351 S.E.2d 148 (1986). Further, we do not find any of the remaining impermissible hearsay to be reversible error.

We address the fact that a copy of the temporary injunction order was attached to the report, which we find highly prejudicial to the Appellants. We found admission of the tempo-

rary injunction order was improper, and it was error to admit it with the expert's report as well. We find that portion of the expert's report to be highly prejudicial; thus, we reverse the decision of the trial court to the extent it allowed the temporary injunction order into the record.

### 3. Exclusion of Damages Evidence and McHenry's Qualification

Because we reverse and remand based upon the above evidentiary issues, we need not reach Appellants' remaining evidentiary arguments regarding the trial court's exclusion of damages evidence and McHenry's qualification as an expert. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

## II. Denial of Directed Verdict and JNOV

"In ruling on motions for directed verdict or [JNOV], the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions." *Steinke v. S.C. Dep't of Labor, Licensing & Reg.*, 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999). " 'In deciding whether to grant or deny a directed verdict motion, the trial court is concerned only with the existence or nonexistence of evidence.' " *Pond Place Partners, Inc. v. Poole*, 351 S.C. 1, 15, 567 S.E.2d 881, 888 (Ct.App.2002) (quoting *Sims v. Giles*, 343 S.C. 708, 714, 541 S.E.2d 857, 861 (Ct.App.2001)). "When considering directed verdict and JNOV motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence." *Id.* "This court will reverse the trial court's ruling on a directed verdict or JNOV motion only where there is no evidence to support the ruling or where the ruling is controlled by an error of law." *Clark v. S.C. Dep't of Public Safety*, 362 S.C. 377, 382–83, 608 S.E.2d 573, 576 (2005); *Hinkle v. Nat'l Cas. Ins. Co.*, 354 S.C. 92, 96, 579 S.E.2d 616, 618 (2003).

 For preservation purposes, when a defendant moves for a directed verdict under Rule 50, SCRCP at the close of the plaintiff's case, he must renew that motion at the close of all evidence. *Wright v. Craft*, 372 S.C. 1, 19, 640 S.E.2d 486, 496 (Ct.App.2006) (citing *Hendrix v. E. Distribution, Inc.*, 316 S.C. 34, 37, 446 S.E.2d 440, 442 (Ct.App.1994), *aff'd in result*, 320 S.C. 218, 464 S.E.2d 112 (1995)). "[If] a party fails to renew a motion for a directed verdict at the close of all evidence, he waives his right to move for JNOV." *Id.* A motion for JNOV under Rule 50(b), SCRCP is a renewal of a directed verdict motion and cannot raise grounds beyond those raised in the directed verdict. *Chapman v. Upstate RV & Marine*, 364 S.C. 82, 88, 610 S.E.2d 852, 856 (Ct.App.2005).

### 1. Civil Conspiracy

 Appellants contend the trial court should have granted their directed verdict and JNOV motions on the civil conspiracy claim because there were no special damages, and, as to appellant Corbin, because there was no evidence of an intent to harm Allegro. We find part of this argument was not preserved for our review, and we disagree with the remainder of Appellants' argument.

### a. Special Damages

First, we review Appellants' argument that there was no evidence of special damages and, thus, the trial court erred in denying their directed verdict and JNOV motions. At the close of Allegro's evidence, Appellants moved for their directed verdict and stated:

With regard to the civil conspiracy cause of action against Ms. Yarborough and Mr. Corbin, as Your Honor's well aware, you have to show a combination of two or more people for the purpose of harming, in this case Allegro, and that there has to be some special damages, not just, the normal damages that are incident to other claims but special damages unique to that conspiracy and the Plaintiff has offered no evidence of any special damages other than the general damages that their expert testified to yesterday. So because of that absence we would submit the civil conspiracy claim should be dismissed.

In Appellants' directed verdict motion at the close of all evidence, they failed to renew their previous directed verdict motion and also failed to argue that there was a lack of evidence as to special damages. Thus, we find Appellants did not preserve this portion of their argument. *See Wright,* 372 S.C. at 19, 640 S.E.2d at 496.

### b. Intent to Harm

In contrast to their argument discussed above, Appellants did specifically renew their contention that Corbin did not have the requisite intent to harm, which is a requirement to be found liable for civil conspiracy. We determine that this portion of the argument is preserved for our review.

" 'A civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff.' " *Cricket Cove Ventures, LLC v. Gilland,* 390 S.C. 312, 324, 701 S.E.2d 39, 46 (Ct.App.2010) (quoting *McMillan v. Oconee Mem'l Hosp., Inc.,* 367 S.C. 559, 564, 626 S.E.2d 884, 886 (2006)); *see also Vaught v. Waites,* 300 S.C. 201, 208, 387 S.E.2d 91, 95 (Ct.App.1989) ("Civil conspiracy consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damage."). " 'In order to establish a conspiracy, evidence, either direct or circumstantial, must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise.' " *Cowburn v. Leventis,* 366 S.C. 20, 49, 619 S.E.2d 437, 453 (Ct.App.2005) (quoting *First Union Nat'l Bank of S.C. v. Soden,* 333 S.C. 554, 575, 511 S.E.2d 372, 383 (Ct.App.1998)). The gravamen of the tort of civil conspiracy is "the damage resulting to [the] plaintiff from an overt act done pursuant to a common design." *Vaught,* 300 S.C. at 208, 387 S.E.2d at 95.

Here, Corbin admitted he had a general knowledge about Allegro's clients because he previously did accounting work for the company. Corbin also admitted he spoke in an advisory capacity with Scully about Scully's interest in Allegro without informing McCarthy of the conversations. In this advisory capacity, Corbin stated he outlined the option of setting up a competitive company and explained there was a letter that

outlined that option along with other options. Specifically, Corbin agreed he was "intimately" involved in all conversation regarding Scully's interest in buying Allegro or setting up his own competing business. The credibility of statements evidencing Corbin only had the intent to help and not injure Allegro are for a jury to decide. Viewing the evidence in the light most favorable to the nonmoving party, Allegro, we find evidence exists to go before a jury to weigh. For the foregoing reasons, we affirm the trial court's denial of Appellants' directed verdict on this ground.

## 2. Contract Claims

Scully argues the trial court erred by failing to grant his directed verdict and JNOV as to the claims for breach of contract and breach of contract accompanied by a fraudulent act. Specifically, Scully contends there was no evidence of any contract between Allegro and Scully, no evidence of any terms of the alleged contract, and no evidence of a breach of the alleged contract. We find a portion of Scully's argument was not preserved for our review, and we disagree with the remaining argument.

## a. Breach of Contract

We find Scully preserved the issue of the existence of a contract for our review. However, we do not think he preserved the argument that the terms of the contract were not proven. *See Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 60, 691 S.E.2d 135, 155 (2010) (holding when an issue is not raised as a ground for a directed verdict, raising the issue in a JNOV motion will not preserve it for appellate review); *see also In re McCracken*, 346 S.C. 87, 92–93, 551 S.E.2d 235, 238 (2001) (stating only issues raised at directed verdict can properly be raised in a JNOV).

At the close of Allegro's case, Scully made the motion for a directed verdict on the claims of breach of contract and breach of contract with fraudulent intent and argued there was no contract between Scully and Allegro, oral or written. Specifically, Scully argued:

The Court: You don't think there was an oral understanding between these two parties in this litigation, between Ms. McCarthy and Mr. Scully?

[Scully's Counsel]: There's been no evidence that there's been any oral understanding between.

The Court: So, are you saying there is no written contract? There is no oral contract?

[Scully's Counsel]: Exactly . . . .

At the close of all the evidence, Scully made a motion for a directed verdict, arguing again that there is no evidence of any contract, oral or written, and so the claims for breach of contract and breach of contract with fraudulent intent could not stand. In his post-trial JNOV motion, Scully stated, "[Allegro] failed to prove the existence of a contract between Scully and [Allegro], the terms of any such contract between Scully and Plaintiff, and the breach of any such contract by Scully."

We hold Scully preserved the issue of the existence of a contract, but he did not preserve the issue of defining the terms of the alleged contract. *See Stokes–Craven,* 387 S.C. at 60, 691 S.E.2d at 155.

"Under the common law, a trial court should submit to the jury the issue of existence of a contract when its existence is questioned and the evidence is either conflicting or admits of more than one inference." *Small v. Springs Indus., Inc.,* 292 S.C. 481, 483, 357 S.E.2d 452, 454 (1987); *Capital City Garage & Tire Co. v. Elec. Storage Battery Co.,* 113 S.C. 352, 101 S.E. 838 (1920); *Benya v. Gamble,* 282 S.C. 624, 627–29, 321 S.E.2d 57, 59–61 (Ct.App.1984). General contract law provides that a " 'contract exists when there is an agreement between two or more persons upon sufficient consideration either to do or not to do a particular act.' " *Carolina Amusement Co. v. Conn. Nat'l Life Ins. Co.,* 313 S.C. 215, 220, 437 S.E.2d 122, 125 (Ct.App.1993) (quoting *Benya,* 282 S.C. at 628, 321 S.E.2d at 60). A contract may arise from oral or written words or by conduct. *Rushing v. McKinney,* 370 S.C. 280, 290, 633 S.E.2d 917, 922 (Ct.App.2006).

We find there is evidence in the record for the jury to weigh the issue of the existence of a contract. While there may not

have been a written contract, there is evidence on the record to suggest an oral contract, or a contract created by conduct. Scully was hired as President of Allegro, and he stated his general responsibilities as president of Allegro were "[t]he daily operations of the business." Scully also admitted he had financial duties as well as the responsibility to act in a good faith manner for the benefit of the company. In addition to those admissions, the record reflects there was testimony regarding a written partnership buy/sell agreement, which included terms about changing ownership and percentage of ownership. Viewing the facts in the light most favorable to Allegro, there is evidence in the record for a jury to weigh whether an offer was communicated to Scully that he accepted, thus creating an employment contract. Therefore, we affirm the trial court on this issue.

### b. Breach of Contract with Fraudulent Intent

Scully's only argument on appeal regarding this issue is that the trial court erred in denying his motion for a directed verdict and JNOV because there was no evidence of the existence of a contract. We disagree.

Because we find there was evidence for a jury to weigh in determining the existence of a contract, we affirm the trial court on this issue.

### 3. Fraud and Negligent Misrepresentation

Scully argues the trial court erred in failing to grant his directed verdict and JNOV as to the claims for fraud and negligent representation. We agree.

"Fraud is an intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to her or to surrender a legal right." *Regions Bank v. Schmauch*, 354 S.C. 648, 672, 582 S.E.2d 432, 444 (Ct.App.2003). "To prevail on a cause of action for fraud, a [p]laintiff must prove by clear, cogent and convincing evidence the following elements: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth;

(8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury." *Moseley v. All Things Possible, Inc.,* 388 S.C. 31, 35–36, 694 S.E.2d 43, 45 (Ct.App. 2010) (citing *Regions Bank,* 354 S.C. at 672, 582 S.E.2d at 444–45).

To prove a claim for the common law tort of negligent misrepresentation, a plaintiff is required to establish the following elements: (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation. *West v. Gladney,* 341 S.C. 127, 133–34, 533 S.E.2d 334, 337 (Ct.App.2000). " 'There is no liability for casual statements, representations as to matters of law, or matters which plaintiff could ascertain on his own in the exercise of due diligence.' " *Quail Hill, LLC v. Cnty. of Richland,* 387 S.C. 223, 240, 692 S.E.2d 499, 508 (2010) (quoting *AMA Mgt. Corp. v. Strasburger,* 309 S.C. 213, 223, 420 S.E.2d 868, 874 (Ct.App.1992). " 'Evidence of a mere broken promise is not sufficient to prove negligent misrepresentation.' " *Turner v. Milliman,* 392 S.C. 116, 123, 708 S.E.2d 766 at 769–70 (2011) (quoting *Sauner v. Pub. Serv. Auth. of S.C.,* 354 S.C. 397, 407, 581 S.E.2d 161, 166 (2003))).

" 'The failure to prove any element of fraud or misrepresentation is fatal to the claim.' " *Austin v. Stokes–Craven Holding Corp.,* 387 S.C. 22, 50, 691 S.E.2d 135, 149 (2010) (quoting *Schnellmann v. Roettger,* 373 S.C. 379, 382, 645 S.E.2d 239, 241 (2007)).

Allegro argues silence when there is a duty to speak can constitute fraud. *See Moore v. Moore,* 360 S.C. 241, 251, 599 S.E.2d 467, 472 (Ct.App.2004) (stating "parties in a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud"). However, while our court recognizes "[n]ondisclosure is fraudulent when there is a duty to speak," this discussion

relates to the separate and distinct claim of fraudulent concealment, not a claim of fraud. *Pitts v. Jackson Nat'l Life Ins. Co.*, 352 S.C. 319, 334, 574 S.E.2d 502, 509 (Ct.App.2002) (quoting *Ardis v. Cox*, 314 S.C. 512, 517, 431 S.E.2d 267, 270 (Ct.App.1993)). Therefore, the element of "false misrepresentation" cannot be premised upon an omission or silence of a party. *See id.*

Here, McCarthy, on behalf of Allegro, testified Scully told her of his plans. Specifically, she stated:

> [H]e told me one day and he told me this three or four times if you do not take the money I'm offering you, I'm leaving Allegro. I am taking Yvonne and Lisa. I am taking 50 percent of the clients. I already know which ones I want and it will be 50 percent of your business and I am going to tear Allegro apart.

Allegro offers no other evidence of false representations made by Scully. McCarthy, on behalf of Allegro, admitted she knew of Scully's desire to purchase Allegro and his intent to start his own business with the possibility of damaging Allegro's business should he not be able to purchase Allegro. Thus, we reverse the trial court on this issue, as there was no evidence to support a showing of a false representation by Scully, and a failure to prove any element of fraud or misrepresentation is fatal to the claim.

## III. Remaining Arguments

Appellants contend the trial court erred in reforming the jury's verdict when the trial court should have either required an election of remedies based upon the jury's verdict or granted a new trial nisi additur.[10] Because we reverse the

---

10. We reiterate that we do not approve the practice of asking a question or responding only to the foreperson regarding a substantive issue about the law or the verdict. When a question arises regarding the law or the verdict form, the better practice is to confer with counsel outside the presence of the jury to discuss the proper response, and then instruct the entire jury in court or in writing and return them to the jury room to act in accordance with the court's instructions. *See Keeter v. Alpine Towers Int'l, Inc.*, 399 S.C. 179, 203–04, 730 S.E.2d 890, 902–03 (Ct.App.2012) (Thomas, J., concurring) (providing the best practice to ensure a valid verdict is for the court to address any questions that arise in front of the entire jury). If a jury verdict form is ambiguous or

trial court on the issues noted above, we need not review this argument. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

## CONCLUSION

Based on the foregoing reasons, the trial court's decision is **REVERSED AND REMANDED.**

HUFF and PIEPER, JJ., concur.

---

unclear, the jury should be returned to the jury room in order to clarify or conform the verdict to its intent before the jury is excused. *Id.*